## TIMOTHY W. HOXIE *vs.* THE HOME INSURANCE COMPANY.

In an action on a policy of insurance on a vessel, brought by the insured who held a mortgage upon the vessel, the defendants claimed that the vessel was fraudulently lost by the misconduct of the master to which the plaintiff was privy, and that the insurance was fraudulently procured with intent that the vessel should be lost. Held, that to prove this, the defendants might show a series of losses under suspicious circumstances of other vessels owned by one of the same parties, and mortgaged in the same manner to the plaintiff.

Hoxie *v.* Home Insurance Company.

Upon questions of knowedge, good faith, or intent, any other transactions from which any inference respecting the *quo animo* may be drawn, are admissible. And where fraud is imputed a considerable latitude must be allowed in the admission of evidence.

Fraud which invalidates a contract, can not be proved under the general issue without notice, under the statute of 1848, (Rev. Stat., tit 1, § 90.) It is consistent with the existence *in fact* of the contract alleged, and is therefore *matter in avoidance* as that term is to be understood as used in that statute.

Where an insurance company has retained and appropriated the premium on a vessel insured and has treated the policy as in force, while knowing the vessel to have been unseaworthy at the time of insurance, and the insured has thereby been induced to rely on the policy as in force, the company is estopped after a loss from claiming that the policy did not attach by reason of unseaworthiness.

But it is not enough that the insurance company had "reasonable means and opportunity for ascertaining the facts."

A waiver is the intentional relinquishment of a known right.

There is an implied warranty of seaworthiness in a time policy of insurance, in the same manner as in a voyage policy.

In determining what degree of seaworthiness is impliedly warranted in a policy, the amount of the premium paid is not a circumstance to be considered.

Where objection was taken to evidence admitted by the court, and the party objecting agreed that the objection might rest until the argument, to be then pursued if he should think fit, and in the argument no allusion to it was made nor any ruling asked of the court, it was held that the objection was waived.

ASSUMPSIT on a policy of insurance on the bark Nimrod, for one year from the 1st day of May, 1860, and another like policy on her freight for the same time; alleging a total loss of the vessel by the perils of the sea on the 2d of February, 1861. The insurance on the vessel was taken by the plaintiff, in the name of T. W. Hoxie & Co., for the benefit of whom it might concern, and that on the freight by James H. Prince, for the benefit of whom it might concern, payable to T. W. Hoxie & Co. in case of loss. The interest of Prince was that of owner of three-fourths of the vessel and freight, and that of the plaintiff that of mortgagee of the interest of Prince in the vessel. The plaintiff resided in Boston in the state of Massachusetts. The bark at the time of the issuing of the policy was lying at the port of Perth Amboy, in the state of New Jersey. She sailed from that port on the 27th of May with a cargo of coal for Aspinwall, but was compelled to put into the port of St. George, Bermuda, for repairs, whence she sailed for Aspinwall, where she discharged her cargo. She

then sailed to Kingston, Jamaica, and on the 24th of January, 1861, set sail from St. Ann's Bay, Jamaica, for London, with a cargo of logwood, sugar and rum, and was totally lost, as alleged, on the 2d of February following.

The defendants pleaded the general issue, with the following notice :—

And the plaintiff will take notice that the defendants will claim, and offer evidence on the trial of said cause to prove, that the said vessel was in an unseaworthy condition when she left St. Ann's Bay, and that the master and commander of the vessel negligently and imprudently continued his voyage after he discovered the leak in said vessel, and that it was his duty to have returned to St. Ann's Bay when he made such discovery ; and that the vessel was lost by the fraud, covin and evil practice of the master and commander.

The case was tried to the jury in the superior court, before *Mc Curdy, J.*

Upon the trial the plaintiff introduced among other evidence the deposition of Oliver G. Lane, who had been master of the vessel during the time covered by the policies, and which contained the following interrogatory and answer with reference to the repairs of the vessel in Bermuda :—" 12. After the repairs were made did you have any, and what, survey upon her, and with what result ? *Ans.*—We had a survey by the same men. The survey pronounced her to be thoroughly repaired, and ordered her to be reloaded." Upon these being read the defendants' counsel objected to so much of the question and answer as relates to the result of the survey. Thereupon the plaintiff's counsel stating that he had authenticated copies of the survey, which had been exhibited to the defendants with the account of the expenditures for repairs at Bermuda, upon inspection of which the defendants had paid the plaintiff therefor, and which the plaintiff proposed thereafter to offer in connection with the deposition, it was agreed that the objection might be reserved to be made in the argument of the case, if the defendants' counsel should deem it best to pursue it. And the deposition having been read without further objection, the plaintiff's counsel produced the copies of

the surveys and accounts, purporting to be authenticated by the United States Consul at Bermuda, which the defendants admitted in court to have been exhibited to them before the payment made by them therefor ; but the defendants objected to the reading of the same in evidence, and the plaintiff's counsel withdrew the same. No further claim was made by either party in regard to that part of the deposition which was objected to, nor was the same referred to in the argument of the case, or any ruling requested in relation thereto by the counsel for either party, and the deposition was handed to the jury when they retired to consider the case, with the knowledge of the defendants' counsel, and without any objection, or request that any part should be obliterated.

The plaintiff claimed to have proved that the bark was lost by the perils of the sea insured against in the policies, and the theory of his counsel was that her loss was occasioned by her springing a leak and being thereby, and by the dissolving of the sugar, which constituted the principal part of her cargo, rendered crank and top-heavy, and incapable of withstanding the agitation of the sea produced by the trade winds and cross currents, after her arrival in the due course of her voyage off Cape Antonio, at the westerly end of the Island of Cuba ; and that her thus springing a leak was owing to the effect of a tropical sun upon her seams during her voyage from Aspinwall to Jamaica, and at St. Ann's Bay, in connection with the heavy straining of the bark during the gale she encountered on her voyage from Perth Amboy to Aspinwall; and which leak, the plaintiff claimed, the utmost vigilance of the master and crew had not been able to discover or guard against. And the plaintiff's counsel claimed that it was proved by the testimony on both sides, that from the time when the vessel was first discovered to be in danger, the course pursued by the captain, officers and crew, was judicious and seamanlike, and most for the interest of all concerned.

The plaintiff was introduced as a witness, and testified that he had for six or seven years past carried on his business in Boston, under the name of T. W. Hoxie & Co. He also testified to the genuiness of the signatures of James H. Prince to

certain mortgages of the bark and her freight to him, and that the indebtedness secured thereby had never been paid ; that the freight on the cargo at the time of her sailing from St. Ann's Bay, and of her loss, at the rate stipulated by the charterers, would have amounted to about $8,000 ; and that he had nothing to do with the equipment or navigation of the ship, his interest in the vessel and freight being that of mortgagee of Prince. On his cross-examination by defendants' counsel, he was asked : " How many vessels the said Prince had been interested in as owner, and the plaintiff as his mortgagee, during the past five or six years ; what insurance the plaintiff had thereon ; and what became of the vessels or any of them ? " The plaintiff's counsel objected to the inquiries on the ground that they were wholly irrelevant to the issue in the case, on the plea and notice of the defendants. The defendants' counsel claimed that they were relevant, and that if allowed to be put it would appear by the answers that Prince had been the owner, during the period in question, of nine vessels, of which the plaintiff was mortgagee, and on which he had insurance, and that seven of the vessels had been lost or so damaged at sea that they were abandoned to the underwriters, and that claims had been made on the insurers therefor, and that no life had been lost in any instance ; and that such testimony would conduce to prove a fraudulent combination between Prince and the plaintiff in regard to such vessels and the insurance and loss thereof, and would also conduce to prove that the policies on the Nimrod and her freight were procured with a fraudulent intent, and that she was fraudulently lost by the procurement of the plaintiff. The court sustained the objection of the plaintiff's counsel and refused to permit the inquiries to be made.

The defendants afterwards introduced Prince as a witness, and offered to put the same inquiries to him, to which the plaintiff's counsel objected on the ground that the same were irrelevant to the issue joined, and the court sustained the objection.

The plaintiff's counsel having introduced the deposition of Captain Lane, and other evidence, tending to prove that the

bark at the times when the policies respectively purported to attach, was staunch, sound and tight, and in all respects well equipped and well officered and manned and seaworthy, but that by reason of a severe gale, which she encountered shortly after she sailed from Perth Amboy with a load of coal for Aspinwall, and which continued with great violence six or seven days, she was severely strained and injured and compelled to put into Bermuda as a port of distress and repair,— the defendants' counsel insisted that, upon the evidence adduced by the plaintiff and defendants, the bark could not have been seaworthy at, and when she sailed from, Perth Amboy. And they prayed the court to instruct the jury that there was an implied warranty on the part of the plaintiff that the vessel was seaworthy at the inception of the risk ; and that if the jury should find that she was then unseaworthy, the policies never attached and were void.

The plaintiff's counsel, on the other hand, claimed the law to be, and prayed the court to charge the jury, that the policies being time policies, and the vessel not then being at her home port, Boston, where the plaintiff resided, but at Perth Amboy, in another state and district, there was no implied warranty of seaworthiness ; and that no such fact was in issue under the plea and notice filed in the case. But the court instructed the jury in conformity with the claim of the defendants.

The plaintiff's counsel further claimed that if there was any such implied warranty, it would be presumed to have been complied with until the contrary was shown by the defendants ; and that if, after the commencement of the voyage, an injury occurred by perils insured against, and the defendants with full knowledge, or after reasonable means and opportunity of ascertaining the facts, on consideration thereof, elected to treat the policies as in force, and to continue the risk and retain and appropriate to their own use the entire premium for the period insured, the defendants would not, in the absence of fraud on the part of the insured, who had been induced thereby to rely on the policies as in force, have a right thereafter to claim that the policies had never attached by reason

of the unseaworthiness of the vessel at the inception of the voyage; and prayed the court so to instruct the jury.

The court charged the jury upon this point, that the claim of unseaworthiness, if it existed, the defendants might waive at their pleasure; and that, in this case, the vessel having been compelled to put into Bermuda, by an injury caused confessedly either by her unseaworthiness or by the perils of the sea insured against, if the jury should find that the defendants, with a full knowledge of all the facts, or the means and opportunity for such knowledge, instead of repudiating the contract of insurance, elected to pay for the damage as having arisen from such perils of the seas, and for that purpose held and applied the premium note for the whole time, then, in the absence of any fraud on the part of the plaintiff, the jury might be justified in finding the fact that the defendants had waived their right to set up as a defense that the policy never attached on account of the unseaworthiness of the vessel.

The defendants claimed to have proved that the vessel sprung a leak in twelve hours out of the port of St. Ann's Bay, in the absence of any severe weather, and was in great danger, and that it was the duty of the master without delay to have returned to port or made a port of safety—either Kingston, Port Royal, Cienfuegos, or Falmouth, which were convenient, but that he ignorantly or improperly kept her on her course until it was too late to reach a port. The plaintiff claimed to have proved that the leak was at first slight, and that there was no danger, and no reason to believe that she could not proceed on her course, and that as soon as it was found otherwise she was steered for the most convenient and proper port, Key West, and that the other ports were not convenient or proper. The defendants asked the court to charge the jury that, if they should find the facts as claimed by them, and that the loss was occasioned by the failure of the master to perform his duty, the plaintiff could not recover.

The court charged the jury that the master, in cases of emergency at sea, is the agent for the benefit of all concerned, and his acts in the exercise of a sound discretion are binding on them; and that if the loss in this case was occasioned by a

peril insured against (the vessel having a competent master and crew,) the defendants might be liable, although the remote cause of the loss was the mistake, misjudgment, miscalculation or negligence of the master in navigating or watching the ship, or in not immediately running for a port of safety.

The defendants further asked the court to charge the jury that the term "seaworthiness" does not mean merely that the vessel is capable of going to sea, or of being navigated on the seas, but that she is sound, staunch and strong in all respects, and able to bear the ordinary force of the winds and seas, sometimes very heavy, without much damage.

The court charged the jury that the term " seaworthiness" means that the vessel shall then be tight, staunch, strong, calculated to bear the ordinary perils of the sea, and likely with proper care to continue so through the term of insurance, in the absence of any of the perils insured against; but that there are different degrees of seaworthiness, and in determining which degree was understood by the parties in a particular case, reference should be had to the existing circumstances, such as the age and build of the vessel, the nature of the service, the amount of the premium, &c.; and that seaworthiness includes competent officers, crew and equipments.

The jury returned a verdict for the plaintiff, and the defendants moved for a new trial.

*Blackman* and *Doolittle*, in support of the motion.

1. The answer to the 12th interrogatory in Captain Lane's deposition was inadmissible, for obvious reasons. It was a parol statement of the contents of a written instrument, a survey. And the survey itself was inadmissible. 2 Parsons Mar. Law, 488, and notes. An exception was taken to the survey, and it was withdrawn; of course we understood that it withdrew parol evidence of its contents.

2. The defendants had a right to cross-examine the plaintiff and Prince, as to other acts of fraud, the result of the same conspiracy. The evidence excluded certainly tended to prove the issue. The bare fact that so many vessels went down, would convince the mind of the directors of any insur-

ance company that fraud was the cause of their loss, and hence Prince could not get insurance in Boston ; and it would tend to satisfy a jury and lead them to the same result.   1 Phillips on Ev., 4 Am. ed., 773 ;  *Benham* v. *Cary*, 11 Wend., 83 ; *Cary* v. *Hotailing* 1 Hill, 311 ;  *Gardner* v. *Preston*, 2 Day, 205 ;  *Lovell* v. *Briggs*, 2 N. Hamp., 223.

3. If there was a breach of the implied warranty, the policy never attached, and the note was without consideration and void.   2 Arnould on Ins., 1210, 1211, and note 1 ;  *Commonwealth Ins. Co.* v. *Whitney*, 1 Met., 21, 23 ;  *Russell* v. *De Grand*, 15 Mass., 35 ;  *Taylor* v. *Lowell*, 3 id., 331 ;  *Merchants' Ins. Co.* v. *Clapp*, 11 Pick., 56 ;  *Porter* v. *Bussey*, 1 Mass., 435 ;  *Penniman* v. *Tucker*, 11 id., 66 ;  *Graves* v. *Marine Ins. Co.*. 2 Caines, 339 ;  2 Parsons Mar. Law, 185. It is said, and the jury were charged, that we were estopped from setting up as a defense that there was a breach of the implied warranty of seaworthiness, because we paid the plaintiff $1,272.44 to take back his notes which were without consideration ;  that is, because we paid one loss under a mistake of fact, we must pay all subsequent losses.   One reason the court assigns for the estoppel is, " that we held and applied the premium note for the whole time."   In other words, if we had paid the plaintiff more money gratuitously, we should not have been estopped.   But it is an elementary principle that a premium note on a time policy is never apportioned. *Tyrie* v. *Fletcher*, 1 Cowp., 666 ;  *Lorraine* v. *Tomlinson*, 2 Dougl., 585 ;  2 Arnould on Ins., 1216 ;  2 Parsons Mar. Law, 186, 187 ; Marshall on Ins., 675.   It is said that we had means of knowledge.   We could only know what the master and owners told us.   They knew more than we did, and conveyed to us such information as they pleased.   They could judge best as to the seaworthiness of the vessel.   The insured and insurer always *suppose* that the vessel is seaworthy when a policy is issued, or at least are *presumed* to suppose so.   A small loss occurs, and is paid on the presumption the vessel is seaworthy.   The presumption of seaworthiness still remains the same as at the inception of the risk, open to investigation when a second loss occurs.   To hold otherwise would force

the insurers to contest small losses, lest that presumption by the payment should be made conclusive. The insurer always has the power to avoid the contract if the policy never attached. 2 Parsons Mar. Law, 185. No authority can be found where he has been divested by the payment of a small loss. Even an adjustment note given by the underwriters for a loss, is not conclusive in regard to the loss for which it is given, where it can be shown to be made under any misconception of the law or the fact. 2 Arnould on Ins., 1203; *Herbert* v. *Champion,* 1 Camp., 134; *Shepherd* v. *Chewter,* id., 274; *Steel* v. *Lacy,* 3 Taunt., 285; *Reyner* v. *Hall,* 4 id., 725; *Kelly* v. *Solari,* 9 Mees. & Wels., 54; 2 Parsons Mar. Law, 444; *Elting* v. *Scott,* 2 Johns., 157; *Buller* v. *Harrison,* Cowp., 565; *DeHahn* v. *Hartley,* 1 T. R., 343. Much less, therefore, can an adjustment or payment be held to prevent the insurer from contesting his liability on a subsequent loss.

4. The court erred in neglecting to charge the jury as requested in regard to the definition and meaning of " seaworthiness." *Capen* v. *Washington Ins. Co.,* 12 Cush., 536, 538.

5. The court was right in charging the jury that there was an implied warranty of seaworthiness in a time policy. This is the well-settled doctrine in this country, and has been held until recently in England, and the late decision of the court of Exchequer Chamber and of the House of Lords, in *Gibson* v. *Small,* against the implication of such a warranty in time policies, is put by the judges upon the ground of the expediency of having a uniform and settled rule in all cases of time policies, rather than upon any ground of principle. This decision, reversing that of the Queen's Bench and overruling former well considered decisions, and not concurred in by all the judges, can not prevail over the well-settled policy and doctrine so long established here. Our decisions are based upon clear principles, and in principle there can be no difference between a time and voyage policy in respect to the implication of a warranty of seaworthiness. 3 Kent Com., 287; 2 Parsons Mar. Law, 147; *Paddock* v. *Franklin Ins. Co.,* 11

Hoxie *v.* Home Insurance Company.

Pick., 227 ; *Martin* v. *Fishing Ins. Co.*, 20 id., 389 ; *Capen* v. *Washington Ins. Co.*, 12 Cush., 517 ; *American Ins. Co.* v. *Ogden*, 20 Wend., 287 ; *Rouse* v. *Insurance Co.*, Monthly Law Reporter, July, 1863, p. 523 ; 2 Arnould on Ins., 652 ; 1 Park on Ins., 458, 467 ; *Hollingworth* v. *Brodrick*, 7 Adol. & El., 40 ; *Sadler* v. *Dixon*, 8 Mees. & Wels., 895, 898 ; *Hucks* v. *Thornton*, Holt N. P., 30 ; *Small* v. *Gibson*, 16 Q. B., 128.

*R. I. Ingersoll* and *C. R. Ingersoll*, contra.

1. The court properly excluded the evidence offered by the defendants with regard to other vessels of the same owner, mortgaged to the plaintiff, and insured and lost during the preceding " five or six years." Nothing in the notice has the slightest relation to any such past transactions, nor is there in it the most remote allusion to any fraud on the part of the insured. Had the ruling been otherwise it is manifest that the jury might have been trying other cases, running through " the past five or six years," instead of the one presented by this record. If the defendants had intended to avail themselves of such a defense, their first duty under the statute was to give us notice of it. Rev. Stat., tit. 1, § 90 ; 1 Swift Dig. 705, 708 ; *Culver* v. *Robinson*, 3 Day, 68, 74 ; 2 Greenl. Ev., § 135 ; Roscoe Pl., 12. In the revision of Swift's Digest by Judge Dutton, Vol. 2, p. 652, on the subject of notice under the act of 1848, the judge says :—" It is believed that it was the intention of the legislature to require notice of the defense of infancy, fraud, duress, and other matters which at common law might in some forms of action be given in evidence under the general issue, and which therefore might be considered inconsistent with the allegations in the declaration." Our statute is recent, but the uniform practice of the profession since its enactment has been in conformity with these views of the learned judge.

But even if fraud were admissible under the general issue without notice, the evidence as offered, of former transactions during " the past five or six years," always presumed fair till proved otherwise, could not conduce to prove that this particular transaction was fraudulent. These transactions were

not offered in connection with any other evidence tending to prove them, or any of them, fraudulent, or to connect them with the policies on the Nimrod. The mere fact that "during the past five or six years" policies had been effected on other vessels on which there were losses, (without any, the slightest evidence to show that they were fraudulent,) was offered as proper or presumptive evidence in itself, conducing to prove that they were the result of a fraudulent combination, and not only so, but as "conducing to prove" that the policies on the Nimrod were procured with a fraudulent intent. It was properly rejected by the court. 1 Greenl. Ev., § 52; *Clark* v. *Beach*, 6 Conn., 149; *Weidler* v. *Farmers' Bank*, 11 Serg. & R., 139.

2. The instructions of the court with regard to a waiver by the defendants of the right to set up the unseaworthiness of the vessel at the inception of the risk, as a defense, were correct. The case shows that this was a "time policy," covering a period from the 1st day of May, 1860, to the 1st day of May, 1861, and that in the early part of the time covered by the policy a loss happened, which compelled the vessel to put into Bermuda. For this loss, the defendants, as the jury under the charge must have found, "with a full knowledge of all the facts, or the means and opportunity for such knowledge, instead of repudiating the contract of insurance elected to pay for the damage as having arisen from the perils of the sea, and for that purpose held and applied the premium note for the whole term." Subsequent to this, and within the term covered by the policy, both parties thus relying on and treating the policy as in full force for the residue of the term, the loss now in question happened. The instructions to the jury were, that if the jury should find such facts, "then in the absence of any fraud on the part of the plaintiffs, the jury might be justified in finding that the defendants had waived their right to set up as a defense that the policy never attached on account of the unseaworthiness of the vessel." The defendants having retained the premium for the whole time covered by the policy, (which it was their duty to have returned to the plaintiffs if the policy had never attached,) and having by

thus continuing the risk, and treating the policy as a subsisting valid contract for the residue of the term, induced the plaintiff to so consider it, and prevented him from obtaining insurance elsewhere, can not now, "in the absence of any fraud on the part of the plaintiff," assert that the policy never attached. Angell on Insurance, §§ 399, 400, 401. The jury might properly have been instructed, that such facts proved would be an estoppel in pais, instead of evidence of a waiver. 1 Greenl. Ev., § 27 ; *Frost* v. *Saratoga Mut. Ins. Co.*, 5 Denio, 154 ; *Sheldon* v. *Conn. Mut. Ins. Co.*, 25 Conn., 207 ; *Bouton* v. *Am. Mut. Life Ins. Co.*, id., 542 ; *Goit* v. *Nat. Protection Ins. Co.*, 25 Barb., 190. But aside from these considerations, this question of implied warranty of seaworthiness at the inception of the risk did not belong to the case. This point will be considered more fully hereafter. Again, no such fact was in issue under the plea and notice filed in the case.

3. The charge of the court in reference to the conduct of the master, as affecting the plaintiff's right of recovery, was correct. It is the well settled doctrine of all the modern decisions in Great Britain and in this country. *Redman* v. *Wilson*, 14 Mees. & Wels., 476 ; *Walker* v. *Maitland*, 5 Barn. & Ald., 171 ; *Bishop* v. *Pentland*, 7 Barn. & Cress., 219 ; *Waters* v. *Merchants Louisville Ins. Co.*, 11 Peters, 213, 224 ; *Columbian Ins. Co.* v. *Lawrence*, 10 id., 507 ; *Nelson* v. *Suffolk Ins. Co.*, 8 Cush., 496 ; 3 Kent Com., 5th ed., 307, note ; 2 Parsons Mar Law, 212, and note.

4. It is manifest from the inspection of the record that there can be nothing to complain of on the part of the defendants as to the answer of Captain Lane to the 12th interrogatory of his deposition. By not pursuing the objection the defendants waived it.

5. The instructions of the court as to the meaning of seaworthiness are upheld by abundant authority. 2 Parsons Mar. Law, 134, *et seq.*

6. The only question made by the defendants·in the court below, as to unseaworthiness, is stated in the motion as follows:—" The defendants' counsel insisted, upon the evidence

adduced by both parties, that the bark could not have been seaworthy when she sailed from Perth Amboy; and they prayed the court to instruct the jury, that there was an *implied warranty* on the part of the plaintiff that the vessel was seaworthy at the inception of the risk, and that if the jury should find that she was then unseaworthy, *the policies never attached and were void.*" It will be seen that the question here presented, is, not whether the loss happened in consequence of the *unseaworthiness of the bark when she left Perth Amboy*, but whether the policy failed to attach by reason of the breach of an implied warranty. The leading case of *Capen* v. *Washington Ins. Co.*, 12 Cush., 517, cited by the plaintiff's counsel, admits that in a time policy, upon a vessel not in her home port, though there is no implied warranty which prevents the policy's attaching, yet there is an obligation on the insured to have his vessel seaworthy at the inception of the risk; and if the insured has failed in that respect, *and a loss is proved to have happened in consequence thereof*, the insured can not recover, though the policy has attached, and in the absence of fraud is good to cover any other loss happening from the perils insured against and not occasioned by the vessel's having been unseaworthy at the inception of the risk. The defendants did not choose to make any such point in the court below, nor could they have made it under the plea and notice. They put their case, upon this part of it, on the question whether there was an implied warranty which prevented the policy from attaching, and not whether the loss was occasioned by reason of unseaworthiness at the time of leaving Perth Amboy. The doctrine claimed by the defendants, that if there is an implied warranty the breach of it prevents the policy from attaching, is not supported by the authorities. *Gibson* v. *Small*, 24 Eng. L. & Eq., 16; *Thompson* v. *Hopper*, 34 id., 266; *Fawcus* v. *Sarsfield*, 34 id., 277. They are mistaken in supposing that the decision in *Thompson* v. *Hopper*, which was made in the year 1856, that there is no implied warranty of seaworthiness in a time policy, was subsequently (1858) reversed in the Exchequer Chamber. There was a reversal, but not on the point of implied warranty.

38 Eng. L. & Eq., 39. All that was decided in the case in the Exchequer Chamber, was, that if the loss happened *by reason of the plaintiffs having sent their vessel to sea when she was unseaworthy*, there could be no recovery. Cockburn, C. J., says:—" I am of opinion that the judgment of the court of Queen's Bench should be reversed. Although it may no longer be open to dispute, that there is no warranty of sea-worthiness in a time policy, I concur with the court of Queen's Bench in thinking that if a ship insured in a time policy is *knowingly* sent to sea by the assured, in an unseaworthy state, *and is lost by means of the unseaworthiness*, the assured ought not to be allowed to recover on the policy." We do not object to this doctrine; on the contrary, it is substantially that of the supreme court of Massachusetts in *Capen* v. *Washington Ins. Co.*, already referred to. The case of *Rouse* v. *The Insurance Co.*, decided by Judge Grier, in the Eastern District of Pennsylvania, and cited by the defendants, is imperfectly reported. It does not distinctly appear, though it is to be inferred, that the vessel when insured was in her home port, Baltimore, where the insured resided, and if so, the case would fall within the exceptions that were held by some of the English judges. We learn from *Thompson* v. *Hopper*, 34 Eng. L. & Eq., 276, that " some of the judges, and Lord St. Leonard, (whose authority in every department of jurisprudence is entitled to the highest respect,) did express an opinion, that in a time policy on an outward bound ship, about to sail *from a port where the owner effecting the policy resides*, there is an implied warranty of seaworthiness; but there was a majority of opinions on the other side." In the present case the court will remark that the vessel was not in her home port where the insured resided, but was in a different state and district. By the maritime law the ports of the different states are considered foreign to each other. Thus in *Pratt* v. *Read*, 19 Howard, 359, Judge Nelson, in giving the opinion of the court in a case of libel for supplies, says :—" This is the case of a foreign ship, the vessel belonging at Buffalo as her home port, and the debt contracted at Erie in the state of Pennsylvania." But whether foreign or not, the question of implied

warranty,in a time policy, if the vessel is not at her home port, where the insured resides, is governed by the same rule as if she had been in a foreign port. It would seem from some of the remarks of Judge Grier, as imperfectly reported, and which the case did not call for, that he went further than the dissenting judges in England seem to have gone. At any rate, the case as construed by the defendants stands alone, and is adverse to the whole current of the modern English authorities, and to the well considered decision of the supreme court of Massachusetts. The judge seems to have overlooked the more recent decisions of *Thompson* v. *Hopper* and *Fawcus* v. *Sarsfield*, both decided in 1856, and relies on an opinion of Baron Parke in the Exchequer Chamber in 1851, though that learned judge, in his more matured opinion in the House of Lords, (in the same case, 1853,) expressed very decidedly an opinion conforming to the principles which the plaintiffs have here urged. See Baron Parke's opinion in *Gibson* v. *Small*, 24 Eng. L. & Eq., 37. He there says:—" The only warranty then, as to seaworthiness, recognized by our law *in a voyage policy*, is, according to all the authorities, that the vessel was seaworthy at the commencement of the voyage. But it is equally clear that there is no satisfactory decision, dictum of a judge, or authority of a text writer, that there is any such warranty at the commencement of the term *in a time policy*."

BUTLER, J. 1. The first point made by the defendants is, that the questions and answers specified in the deposition of Capt. Lane should have been excluded from the consideration of the jury. We are satisfied they were inadmissible, and should have been erased. But they were retained in consequence of the laches of the defendants, and neither the plaintiff nor the court committed any error. The defendants agreed that the objection might be reserved to the argument of the case, to be then pursued by them if they saw fit to pursue it. They did not then pursue it. Doubtless they agreed to the reservation under the impression that the surveys would be offered and might be admissible. But when

they were offered, objected to and withdrawn, we think it was the duty of the defendants to *pursue* the objection, and that unless they did so the court and the plaintiffs might presume that the objection was waived.

2. In connection with evidence tending to show a fraudulent loss of the vessel by the direct misconduct of the master, the defendants offered to inquire respecting what they claimed to be an extraordinary series of losses under suspicious circumstances, of other vessels owned by one of the same parties, and mortgaged in like manner to the plaintiff, and insured, as tending to show a fraudulent combination to insure and lose vessels, and therefore to procure the insurance from the defendants and others on this vessel with intent she should also be fraudulently lost. Whether the evidence was rightly excluded or not involves a two-fold inquiry ; viz., 1st. Was the evidence relevant ? and 2d., Was it admissible under the pleadings ?

We are satisfied that the evidence was relevant. Upon questions of *knowledge, good faith* or *intent,* any other transactions from which any inference respecting the *quo animo* may be drawn are admissible. And where fraud is imputed and within the issue, and provable by various circumstances, a considerable latitude must be indulged in the admission of evidence. *Benham* v. *Cary,* 11 Wend., 83. These principles would justify the admission of the evidence offered. It has sometimes been thought that the other transactions should be cotemporaneous, or nearly so, but that is not essential. A fraudulent combination and fraudulent motive may be inferrible from a *series* of successive transactions of a fraudulent or suspicious character and in respect to such a subject matter. In this case, if there had been a considerable number of vessels cotemporaneously purchased, mortgaged, insured heavily, both vessel and freight, and by both owner and mortgagee, and lost suspiciously in moderate weather, some inference of fraudulent combination and intent as to all would be unavoidable. But a series of similar transactions effected in the same way by the same parties with the same result, would excite the same suspicion and induce the same

inference. Indeed the latter might be equally suspicious because such a method of perpetrating such frauds is the most feasible, requiring less capital, a less number of conspiring captains to be trusted, is less likely to be generally suspected, known or remembered, and therefore as likely to be adopted. The authorities more or less applicable on this subdivision of the point are numerous, and may be found collected (including *Gardner* v. *Preston*, 2 Day, 205, and *Treat* v. *Barker*, 7 Conn., 274,) in note 333 of Cowen & Hills' edition of Phillipps on Evidence.

But we are not satisfied that the evidence was admissible under the notice. It does not allege either an original fraudulent combination of the owners and of the plaintiff before the insurance was obtained, nor any connection with or assent to an intended loss by the fraud and evil practice of the master after the insurance was effected. The fraud of the master was barratry, (notwithstanding he was part owner,) and a peril insured against, unless the other owner or the plaintiff assented to it. It was essential to the intended defence therefore, that either the original combination or the subsequent assent should be proved. The one goes to show that the contract, although *prima facie* valid, was void ; the other, that the evil practice of the master, which was *prima facie* barratry, was not such, but the fraud of the other owner and the plaintiff also. And both were matter of avoidance, and should have been inserted in the notice. The action is assumpsit on an express contract, and doubtless under the rules of the common law as gradually relaxed from their original strictness, and existing prior to the statute of 1848, would be admissible under the general issue alone. But that statute changed the common law in that respect, and since its passage fraud, if relied upon, must be set up. If there is an apparent distinction between fraud which goes to the original validity of the contract, and fraud which operates in avoidance of it after its execution, that distinction is not real, and seems to be practically disregarded in the recent rules incorporated into the English practice ; for those rules provide that " all matters of confession and avoidance, including not only those by

way of discharge, but those which show the transaction to be void or voidable in point of law on the ground of fraud or otherwise, shall be specially pleaded," &c. So it is provided in the Irish act of 16 and 17 of Victoria, that " every defense which admits a contract in fact, but relies on matter of avoidance or discharge, or illegality on the ground of fraud," &c., shall be pleaded. The English rules and the Irish act therefore, make no distinction between fraud before and after the execution of the contract. Here there was a contract *in fact*, and the evidence offered was of a fraudulent conspiracy which affected the legality of a contract prima facie valid, and if not strictly matter of avoidance, it was clearly " consistent with the truth " *in fact* " of the material allegations of the declaration," and therefore within the statute. And so, according to the construction given by us to the statute in the recent case of *Mahaiwe Bank* v. *Douglass*, 31 Conn., 170, the evidence of fraud was clearly matter of avoidance also, and within it. There we held the evidence admissible under the general issue, because it showed that the contract set up never was *in fact* executed by the defendant. Here the execution of the contract is conceded, and the defense should have been set up in the notice ; and for that reason the testimony was rightfully excluded.

3. The court having charged in conformity to the claim of the defendants, that there was an implied warranty of seaworthiness incident to a time policy, the plaintiff requested the court to charge in substance, that if, after the partial loss, the defendants, with knowledge or reasonable means and opportunity of ascertaining the facts, *on consideration thereof* elected to treat the policy as in force and continue the risk, and retain or appropriate the entire premium for the entire period, and the plaintiff had thereby been induced to rely on the policies as in force, the defendants would be estopped from claiming that the policy did not attach because of the unseaworthiness of the vessel. Irrespective of the alternative of " reasonable means and opportunity of ascertaining the facts," that request was a legal and proper one. If the defendants *knowing* her to have been unseaworthy at the inception of the

risk, elected to continue the risk and take the entire premium and thereby induce the plaintiff to rely on the policies as in force, they would have been as matter of law and justly estopped. Such is the doctrine of the case of *Frost* v. *Saratoga Mutual Ins. Co.*, 5 Denio, 154, and the other cases cited by the plaintiff. And if by the introduction of the alternative " or after reasonable means and opportunity of ascertaining the facts," the eminent and lamented counsel who tried the case for the plaintiff in the court below* meant nothing more than that when the information contained in the surveys was offered to the defendants, they deeming the vessel *then* fully repaired and seaworthy *chose* to *waive* inquiry and continue the risk whatever the fact respecting seaworthiness may have been at the inception of the risk, and acted and induced the plaintiff to act accordingly, perhaps the request might be sustained. But the charge of the judge embodies a very different proposition. The import of it is, that, an injury having been sustained confessedly by her unseaworthiness or the perils of the sea, if the defendants had means and opportunity for ascertaining whether by reason of unseaworthiness or not, *they were bound then to inquire;* and if they did not, and paid the damage and took the benefit of the premium note—or in other words, acted without inquiry, as if there had been no breach of warranty—they *waived* all right to the benefit of such warranty, if they should afterwards learn that the vessel was unseaworthy at the inception of the risk, and was ultimately lost in consequence of it. That proposition can not be sustained.

A waiver is the intentional relinquishment of a known right, and there must be both *knowledge* of the existence of the right and an *intention* to relinquish it. These defendants were entitled to presume, and rely on the presumption, that the plaintiff knew the condition of his vessel when he applied for the insurance, and that he concealed nothing, but made an honest contract. " And where there is no proof either way, seaworthiness is to be presumed;" (per SHAW, C. J., 12 Cush.,

---

* Hon. Roger S. Baldwin, who died during the pendency of the case.

535.) They were not therefore bound to inquire, and having no actual knowledge they waived nothing. Besides, the plaintiff claimed that the injury resulted from the peril of the seas. If it resulted from unseaworthiness which existed at the inception of the risk, he must be presumed to have known it, and therefore to have been guilty of fraud in concealing the fact and making the claim for the loss, and should be estopped from setting up that claim of waiver. We know of no authorities or analogies to sustain this part of the charge of the court.

The plaintiff seeks to avoid the effect of this error by claiming that there is in the law no implied warranty of seaworthiness incident to a time policy, and that therefore there was none in this case ; that the ruling of the court on that point was erroneous ; and that the defendants were not therefore prejudiced by the subsequent error in the charge, and substantial justice has been done. This claim of the plaintiff involves a question which has been quite recently raised and very much discussed in England, and also in the case of *Capen* v. *Washington Ins. Co.*, 12 Cush., 517, and is of very considerable practical interest.

That there is such an implied warranty in respect to voyage policies is conceded. It must also be conceded that such a warranty has been implied in respect to time policies, both in England and this country, from the time when they came in use until the question was raised in the recent case of *Gibson* v. *Small*, in the year 1848. In that case it was holden in the Queen's Bench, in accordance with what had been universally received as law, that there was an implied warranty of seaworthiness in a time policy. The case was carried to the Exchequer Chamber, where the decision of the Queen's Bench was reversed ; and was subsequently taken to the House of Lords, where the decision of the Exchequer Chamber was affirmed. By that decision it was settled as the law of England that a warranty could not be implied in respect to a time policy unless under special circumstances, but without indicating what the special circumstances were which would constitute any particular case an exception to the general rule

thus established. Some of the judges intimated that if the ship was in the home port of the owner, and was bound upon a known voyage, and the policy covered a time extending beyond the contemplated voyage, the warranty should be implied. But when that precise case was subsequently presented in the Queen's Bench, in the case of *Thompson* v. *Hopper*, 34 Eng. L. & Eq., 266, that court refused to imply the warranty, (Earle, J., dissenting) for the reason mainly, that the House of Lords had holden that there was no such warranty as a rule, and that it was "expedient" that there should be none as an exception, and that the rule should be uniform and "inelastic."

When the case of *Gibson* v. *Small* was before the House of Lords, the opinions of all the judges upon the question were called for and given ; and we have deemed it important to look to those opinions, as well as to the opinions expressed by the Lords and in the court of Queen's Bench and Exchequer Chamber, upon the propriety of making such an innovation upon the law. A careful examination of them has failed to satisfy us that the change, if a correct one for that country, should be adopted here.

The warranty of seaworthiness is a necessary incident to the contract of marine insurance, for it involves a condition of the subject matter absolutely essential to its fairness and honesty. The contract is one of indemnity against extraordinary perils, and it is necessarily implied that the vessel is or shall be able to endure the ordinary perils to which it may be exposed, and that ability constitutes seaworthiness. If it were not so, if it were not in the contemplation of the parties that the ship was or should be capable of performing her voyage, the earning of the premium by the underwriter could not be contemplated, there would be no consideration for the contract, and the obligation would fail. Such was substantially the language of Lawrence, J., in *Christie* v. *Secretan*, 8 T. R., 198, and it was also said by Lord Mansfield that "the ship being capable of performing the voyage was the substratum of the contract of assurance." The doctrine involved in these dicta has frequently been recognized in England, and was expressly

admitted by several of the judges in *Gibson* v. *Small*. One of them however, Talfourd, J., did say, " It will be found on an examination of all the text-writers that the doctrine (of implied warranty) is generally based on the more limited consideration of the power of the owner to render his vessel seaworthy at the commencement of the adventure insured, and on the means of knowledge fairly attributable to him at the time of the contract." If such are the deductions of the English text-writers, they are clearly imperfect. Upon the question whether the rule should be a *general* one or not, and in determining its reasonableness, the fact that a knowledge of the condition of the vessel may fairly be attributed to the owner, and that it will be in his power to make her seaworthy in *most cases*, were undoubtedly taken into consideration. But the cause, " the substratum," which induced that consideration and the establishment of the rule, was the *necessary implication* that both parties *must* have contemplated the state of the ship when the risk was to begin as a seaworthy one. And that such is the nature of the contract and the foundation of the rule has always been recognized by the courts of this country. In *Paddock* v. *Franklin Ins. Co.*, 11 Pick, 232, Judge Shaw cites approvingly the dicta of Lord Mansfield and Mr. Justice Lawrence before referred to, and says that " the rule that the ship must be seaworthy at the inception of the risk is a necessary incident of the contract." Other similar citations might be made, and it would seem to be beyond dispute that the warranty of seaworthiness implied in a voyage policy is founded on the nature of the contract and the subject matter of it and the necessity of the case, and that it is implied in the law because it is as essential to any valuable right of the insurer under it that the vessel should be seaworthy, as that she should be in existence at all.

Now if such be the nature of the contract and the necessity for implying the warranty, why should it not be implied as a rule in time policies ? or at least when a knowledge of the condition of the vessel and an ability to repair her can be fairly attributed to the insured ? We have looked through the opinions of the English judges for a satisfactory answer to

this question, but we have looked in vain. Many of the judges and some of the peers admitted that in the latter case the analogy was perfect and the warranty should be implied. But a majority were of opinion that the analogy would not hold in most cases, and several reasons were given by one or another of them. Two of these reasons only seem to require serious consideration. One of them was that in *most cases* of time policies the condition and situation of the vessel could not be known to the parties at the time of making the contract. This seems to have been assumed and not controverted by the other judges, and it may be true in the commerce of that country, but if so it must result from the fact that England has many and distant colonies, and very much of her commerce is to, from, and among them, and time policies are taken with a view to contingent deviations from one colony to another which work a forfeiture in voyage policies. But it is not found or suggested that such a state of things exists here; nor have we any reason to believe that it is, or will be so. We have no colonies, very much of our commerce is coastwise and internal, or direct from some port of our extended seaboard to and from some foreign port, communication by rail or telegraph with most of our ports is direct and speedy and is not difficult by steamer directly or indirectly with the principal foreign ports, and it may well be assumed that in a large majority of cases where time policies are taken here the ability to repair and knowledge of the condition of the vessel may fairly be attributed and the analogy exist.

The other reason given is, that the analogy does not hold because in a voyage policy the precise adventure insured is set out in the contract, and the degree of seaworthiness required may be definitely and clearly understood by the parties; whereas in a time policy no course of employment is set forth, and a warranty of seaworthiness would require the vessel to be fitted and equipped for any employment, and in any port of the world, and therefore that it is unreasonable to imply the warranty. This argument evidently had weight with the court in *Capen* v. *Washington Ins. Co.*, 12 Cush., 517, but it is clearly unsound. The insured *solicits* the insurance and *selects* his policy. As matter of fact in most

cases, the intended course of employment is known and represented to the insurers, to enable them to fix the rate of premium. If that is the case there can be no difficulty. The insurers contemplate that course of employment and insure against its extraordinary perils, and it is just and reasonable that the insured should be held to a warranty of seaworthiness adapted to the employment. And if the course of employment is not known or stated, the insurers insure against *all* extraordinary perils, and it is equally just and reasonable that the insured should adapt his vessel to *all* ordinary perils, or adapt the course of employment to the capacity of the vessel. It is at his option that the time policy is taken, the course of employment is under his control, and justice requires that he should be held by warranty to that degree of seaworthiness which the time and course of employment *he* desires and selects may demand. Indeed, it seems to us that the implication of the warranty is not only as just and reasonable in such a case as in that of a time policy, but that the option in respect to employment absolutely requires it for the protection of the underwriter.

The other objections urged do not deserve consideration. There are difficulties attending the implication of the warranty as a rule in both descriptions of policy, but they are not materially greater in respect to one than the other, nor are they greater than attend other general rules deemed essential in the law.

And there is another controlling reason why the warranty should be implied in this case. The commerce of this country is national in character and to some extent in its regulations, but the principles of commercial law governing it may be different in the different states. It is desirable that they be kept as uniform as possible. In respect to the question involved here they are uniform, and we are unwilling to follow an adverse English decision and disturb that uniformity. The plaintiff indeed says that it has already been disturbed by the case of *Capen* v. *Washington Ins. Co.*, and relies on that case as an authority, but we do not so understand that case, and we should hesitate to follow it if we did. The action was on a time policy, on a vessel which was at sea when the contract

was made, which returned and landed her cargo safely and was burnt at sea on a subsequent voyage. No question was seriously made in respect to the seaworthiness of the vessel at the inception of the risk, and the counsel declined going to the jury on that question of fact, and the case went up on the questions of law raised by instructions which the court proposed to give the jury on the other issues. Those questions were, 1st, whether in any contract of insurance on time there is an implied warranty of seaworthiness at the inception of the risk ; 2d, whether, if she was seaworthy, and the policy became operative and attached, the warranty required the vessel to be kept in a seaworthy state during the entire period covered by the policy. In discussing the question whether there was such a warranty C. J. Shaw laid out of the case the question involved here. He said :—" We have thought it sufficient to state the ground of our present decision, leaving similar and analogous cases, varied and qualified perhaps by different circumstances, to be decided as they arise." And he then went on to say :— " In the first place it is distinguishable from the case of a time policy, when the vessel is in port at the time the policy is made to take effect at the inception of the risk, and first sails after the policy has attached—whether it be from a home port, a neighboring, or a foreign port," &c. Other qualifying circumstances are stated, not material here, and also the fact that seaworthiness at the inception of the risk must be presumed in the case inasmuch as there was no evidence to the contrary. He then states the real question to be decided in the case thus :—" Recurring then to the general question as above stated, *divested of any qualifying circumstances,* the court is of opinion that in the contract of insurance on which *this action* is brought, there was no implied warranty on the part of the assured that the vessel was seaworthy at the inception of the risk." All that we find determined in that case therefore is, that if the ship is at sea when the risk is to commence there is no implied warranty of seaworthiness, but it may be otherwise if as in this case she is at " a home port, a neighboring or a foreign port; " and although the case is an exception to the otherwise unbroken current of decision in

this country, recognizing an implied warranty of seaworthiness in a time policy in *all* cases, it is not an authority for overruling the decision of the court below.

The objection to the use of the words " amount of premium," in that part of the charge which is descriptive of the term seaworthiness, is also well taken.

For these reasons a new trial is advised.

In this opinion the other judges concurred; except Mc-Curdy, J., who having tried the case in the court below did not sit.

NOTE.—The foregoing case was argued and decided at the September term of the court in New Haven county, but the opinion was not delivered to the reporter in season for the report of the case in the last volume among the cases of that term. The judges who then held the court were the same with the present with the addition of Judge Sanford. Since the decision the case of *Hoxie* v. *Pacific Mutual Ins. Co.*, 7 Allen, 211, has appeared, in which the supreme court of Massachusetts, all the judges concurring, has holden that there is an implied warranty of seaworthiness in a time policy. The question is elaborately and most ably discussed by Chief Justice Bigelow. R.