AUGUST METTNER, Appellee, v. THE NORTHWESTERN NATIONAL LIFE INSURANCE Co., Appellant.

Life insurance: FORFEITURE: WAIVER: EVIDENCE. In an action for
1   damages against an insurance company for the wrongful cancellation of a life policy on the ground of failure to promptly pay premiums, the evidence is held to justify a finding that the company waived its right to cancel the policy and forfeit the premiums paid, by including in a required health certificate unauthorized provisions and by retaining the delinquent premiums for an unreasonable time.

Retraction of waiver. Waiver of a forfeiture of a life policy,
2   though without consideration, cannot be retracted.

*Appeal from Chickasaw District Court.*—HON. L. E. FELLOWS, Judge.

WEDNESDAY, APRIL 5, 1905.

ACTION to recover damages for the wrongful and unlawful forfeiture by the defendant company of a policy of life insurance held by plaintiff therein. The case was by agreement tried to the court without a jury, resulting in a judgment for plaintiff for the amount of premiums paid, with interest. Defendant appeals.—*Affirmed.*

*Brown & Kerr* and *F. F. Swale,* for appellant.

*R. Feyerbend* and *Springer, Clary & Condon,* for appellee.

DEEMER, J.—In July of the year 1892 the Federal Life

Association of Iowa, a corporation doing a life insurance business in this State, issued to plaintiff a policy of life in-

1. FORFEITURE: waiver; evidence.

surance in the sum of $1,000, upon condition that he pay a quarterly premium of $7.39 on or before the 1st days of January, April, July, and October in each year during the life of the policy. This policy provided, among other things, that, if any quarterly payment· be not paid when due, time being made of the essence of the contract, the policy should be null and void, and all payments should be forfeited to the association. It also provided that, if any member forfeited his membership, he might within sixty days after the default make a written application for reinstatement, and, upon furnishing satisfactory evidence of good health, and upon payment of all arrearages, be reinstated by the board of directors. It was also provided that, when the policy had been sustained for five consecutive years or longer, if the policy holder did not wish to make further payments, a paid-up, nonparticipating policy would be granted for the full amount of the savings-fund accumulations standing to the credit of the policy, payable at death, provided the policy was legally surrendered therefor, at the office of the company, within three months from date of lapse. This savings fund was to be made up from the surplus derived from quarterly payments in excess of the amount necessary to create a surety fund, limited to $10,000; an expense fund limited to seventy-five cents per quarter, and the payment of death losses actually resulting. July 25, 1900, the National Mutual Life Association of Minneapolis contracted with the Federal Life Association to assume all its policy obligations, pursuant to the terms of the several policies, and to the articles of incorporation and by-laws of the said Mutual Life Association. One of the by-laws of this latter company provided that premiums should be paid in advance, and that failure to make any payment on or before twelve o'clock noon of the day when due *ipso facto* canceled the contract, and released the company and the in-

sured· from any further liability.  February 21, 1901, the defendant company reinsured plaintiff's life, and assumed all the policy obligations of the National Mutual Association, subject to the provisions of the several policies and by-laws of the Mutual Company, and the provisions of the first contract of reinsurance.  The policy of reinsurance between the Mutual Life Company and the Federal Association contained this provision:

It is understood that the policy or certificate assumed shall be charged with a lien of a sum equal to the present value of the face of the policy or certificate assumed, due at the end of the present expectancy of the life assumed as shown by the American Experience Table of Mortality, at " four and one-half" per cent interest plus " four " per cent of the face of the policy for General Fund purposes, said lien constituting a single premium which is loaned by said National Mutual Life Association to the said assured, against which shall be credited all premiums or assessments hereafter paid by said member, with " four and one-half " per cent interest thereon from the date of payment, the unpaid portion to be payable from the face of the policy or certificate at maturity, the same to be considered as security therefor.

And in the contract between these two companies we find this provision:

It is understood and agreed that the members of the said party of the second part, reinsured hereunder by said party of the first part, shall be reinsured upon what is known as the life expectancy or single premium plan, whereby each of such reinsured members shall be charged with a single premium according to his attained age and four and one-half per cent interest, which single premium represents the present worth of the face of the policy or certificate assumed due at the end of the life expectancy of the life reinsured according to the American Experience Table of Mortality at four and one-half per cent compound interest, plus four per cent of the face of such policy or certificate as a life loading for expenses, which single premium shall be treated as a loan by said party of the first part to such member and

may be paid in one sum or in installments or premiums, and such reinsured member shall have the privilege of paying such installments of premiums or assessments as he has heretofore been paying to said party of the second part, or he may pay the regular installments required by the life expectancy or single premium plan of said party of the first part or he may pay larger sum at his option, receiving credit for the payments made by him to said party of the first part, and in event of maturity of the certificate or policy by death before such single premium shall have been thus paid, then the balance thereof shall be paid by the beneficiary or reserved by the said party of the first part, from the face of the policy.

Plaintiff did not remit the quarterly premium due July 1, 1902, until the 2d day of that month; and, according to the statement of the defendant company, this premium was not received by it until July 7th. Upon receipt thereof, and under date of July 7th, the defendant wrote plaintiff to the effect that the premium was due June 30, 1902; that it was not received until July 7th, and that, by the terms of the policy, it became forfeited *ipso facto;* that his (plaintiff's) insurance had terminated; and that he was no longer a member of the company. It also stated that the remittance would not be received or accepted in payment of the premium, but would be held subject to plaintiff's order. Plaintiff was also informed in this letter that reinstatement of a lapsed policy was discretionary with the officers of the company, and could only be obtained upon satisfactory evidence of continued good health. He was also informed that, if he desired reinstatement, he should fill out an inclosed blank form of health certificate, and that, if he was reinstated, his policy would be credited with the premium sent, and his policy thus revived. The letter continued as follows:

If your application for reinstatement is not received within thirty (30) days we will take it for granted that you desire us to return the remittance to you.

The Northwestern National Life Insurance Company does not by thus treating or holding your last remittance,

nor by sending, or receiving, or considering an application for reinstatement or a health certificate, nor in anything it does in the premises, or hereby, except by absolute reinstatement and revival of the policy and written notice thereof to you, waive the forfeiture which has occurred.

Plaintiff made no reply to this letter, and on September 5th the defendant returned the premium remittance received from him. Under date of September 15th, plaintiff returned the premium to the company, and it, in turn, on September 17th, returned the same to plaintiff, with a statement that his policy had lapsed, and that, to renew the same, it was necessary to have a health certificate duly signed; and another blank was sent, to be filled out and returned to the company. A statement was made in this letter to the effect that if the health certificate, when returned, should be approved by the medical department of the company, the policy would be reinstated; otherwise the premium would be returned, as the policies were then null and void. Again, under date of September 26th, plaintiff returned the premium due July 1st, and also sent a draft for the premium maturing October 1st. Thereupon, under date of October 11th, the company returned these drafts, with a statement that the policy had lapsed. No further payments were made by the plaintiff, and this action was commenced February 12, 1903.

Plaintiff never furnished the defendant company with a health certificate, nor did he at any time expressly object to the forms sent him by the company. His position was embodied in the following excerpt from his letter of September 15th.

It might interest you, if I tell you, that the Mettners often paid such premiums after they were due and that your new policy [the National Life] expressly provides that unpaid premiums shall be a debt to your company, you to have a lien, etc., on policies. Other matters, which I need not now disclose, combine to estop you from claiming forfeiture.

You can consider this a written notice of our election to insist on our rights under the said policies.

The blank health certificate first sent the plaintiff contained, in addition to the usual requirements, a waiver of the provision of the law prohibiting plaintiff's physician from testifying against him, and an agreement that, from that time on, plaintiff would be bound by present and future by-laws of the company. The second health certificate contained no such provisions.

Under the facts above recited, plaintiff's counsel practically admits there was a forfeiture of the policy for non-payment of the premium due July 1st, and that he cannot recover in this action unless he shows a waiver of this forfeiture, or an estoppel on the part of the defendant from relying thereon. While many things are relied upon as constituting this waiver or estoppel, we shall not refer to all, but content ourselves with a reiteration of those matters whereon we are constrained to hold that the trial court was justified in coming to the conclusion that it did, or which to our minds furnish such a basis for its finding as to preclude our interference. Before going to these, it may be well to again state what a waiver is. It has been shortly defined as "the intentional relinquishment of a known right." Perhaps a better and more comprehensive definition is given by Mr. Bishop in his work on Contracts, section 792, as follows: "Waiver, in a general way, may be said to occur whenever one in possession of a right conferred either by law or by contract, and knowing the attendant facts, does or forbears to do something inconsistent with the exercise of the right, or of his intention to rely upon it, in which case he is said to have waived it, and he is estopped from claiming anything by reason of it afterwards."

We now recur to the facts. The receipts given by the defendant for premiums paid each contained this statement: "It is understood that the receipt of this company of payments after due is only on condition that the member is alive and in good health at the time of such receipt." On this statement, re-enforced by a custom on the part of other

companies to accept premiums after due, plaintiff says he relied when he sent the premium on July 2, 1902. That is to say, he testified that he believed therefrom that defendant would receive overdue premiums if the insured was in good health at the time the premium was received. Defendant received the July premium on the 3d of that month, and, in acknowledging the receipt thereof, made the statements to which we have already referred; among them being a virtual promise to return the money within thirty days if an application for reinstatement had not then been received. Plaintiff was justified in believing that, if the remittance was not returned within the time promised, the matter would still be open for reinstatement, or that the company would not rely upon the forfeiture. Plaintiff had in fact sixty days within which to apply for reinstatement, and it will be noticed that the defendant, instead of returning the money, as promised, held it until after the sixty days for reinstatement had passed, and then stated that it had been held for thirty days awaiting receipt of health certificates on account of lapse of policy at the time the premium was received. In its first letter, under date of July 7th, it had demanded a form of health certificate which it was not authorized to demand, and imposed conditions to reinstatement which it could not insist upon. This of itself is quite significant, and perhaps relieved the plaintiff from making any attempt to comply with the terms of his contract as to reinstatement. But however this may be, the defendant offers no excuse for the retention of the money from August 7th to September 5th; and we cannot say, as a matter of law, that plaintiff did not have the right to assume that defendant had waived its right of forfeiture, and was content to hold the premium without any application for reinstatement. He did not learn anything to the contrary until it was too late to furnish a health certificate in compliance with the terms of his policy. That is to say, the money was not returned to him finally until September 5th. Again, when plaintiff returned the

premium due July 2d, and the one maturing October 1st, in a letter of date September 26, 1902, which must have been received by the defendant on the 27th of that month, nothing was said or done by the company until October 11, 1902, when it returned these premiums, with a statement that the policies had lapsed. This conduct on the part of the company, which was in no manner explained by it on the trial — for it offered no testimony from its officers or agents — was sufficient, in our judgment, upon which to base a finding of waiver or estoppel. An insurance company cannot exact new conditions for reinstatement. If it does so, and insists thereon, it may be held to have waived the presentation of any other, and to be bound on its original contract. *Davidson v. Society,* 39 Minn. 303 (39 N. W. Rep. 803, 1 L. R. A. 482). But however this may be, the conditions were such that when defendant received plaintiff's letter of September 26th, inclosing the July and October premiums, and stating that he did not recognize its declaration of lapse, and that, if it refused to receive the premiums, he should apply to the courts for protection, it should have acted with great promptness. Receipt and retention of premiums after forfeiture is a waiver thereof. This defendant knew. It also knew that plaintiff was insisting there had been no valid forfeiture. Under the circumstances, it was defendant's duty to be on the alert to see that no premiums were received and retained after the declaration of forfeiture for more than a reasonable time within which to return them. It knew or should have known that, if it kept them for more than this reasonable time, the forfeiture would be waived. *United Brethren v. Schwartz,* (Pa.) 13 Atl. Rep. 769; *Jenkins v. Ass'n,* 111 Ga. 732 (36 S. E. Rep. 945); *Weiberg v. Ass'n,* 73 Minn. 297 (76 N. W. Rep. 37). The defendant company kept this last remittance from September 27th until October 11th without any explanation therefor. Indeed, it gives no reason now for not returning the money at once. Whether or not these premiums were re-

tained an unreasonable length of time was a question of fact for the trial court, and with its conclusion on this matter we are not disposed to interfere. *Odd Fellows Ass'n v. Sweetser,* 117 Ind. 97 (19 N. E. Rep. 722).

As has been observed, the case was tried to the court as a law action, and we are constrained to hold that there was enough evidence to justify it in finding that there was a waiver of the forfeiture for nonpayment of the July premium. No consideration was necessary to support the alleged waiver. Such a result arises from conduct, and is ordinarily a question of fact for the trier of such an issue.

Appellant has not successfully met these propositions. It contends that while waiver might, perhaps, be found from the facts we have recited, yet, as it was without consideration, it might be retracted, and was in fact in this case, and therefore is not binding upon it. But this is manifestly unsound. The delay was not long in either case, it is true; but the circumstances were such as to require prompt action on the part of the company, and it has offered no excuse whatever for its conduct. It planted itself squarely on a technical forfeiture, and is in no position to complain of a technical rule as to waiver. It sought to impose new and unwarranted conditions in its blank form of application for reinstatement, and offers no excuse or justification therefor. It did not finally return the July premium until plaintiff had lost his right to reinstatement in accord with the terms of his contract. Forfeitures are not favored in law, and sometimes slight and comparatively trivial circumstances will be sufficient to constitute a waiver thereof. This is hornbook law, and needs no citation of authorities in its support. In such cases as this the conduct of the insurance company should not be equivocal in character, but honest and straightforward. While insisting upon a lapse, it should not hold the policy holder's money for an unreasonable length of time, and thus induce him to believe that his policy is in force. Moreover, it is doubtful if defendant had the

2. RETRACTION OF WAIVER.

right to forfeit the policy as a whole, and to deny plaintiff's membership in the company, in view of the provision with reference to paid-up insurance. Of course, plaintiff did not demand this, and is not suing for it now; but defendant's conduct in declaring a forfeiture should be measured with reference to plaintiff's contract rights, in arriving at a proper solution of the question of forfeiture.

We have not considered every question argued, for to do so would unduly extend an opinion already too long. The controlling thought, after all, is not what we might think of the questions of waiver and estoppel, had the case been submitted to us for trial *de novo,* but, rather, is there sufficient testimony to support the finding of the trial court on the issues of fact, and to negative the thought that its conclusion on the whole case was the result of prejudice or passion? That there is sufficient testimony to support the judgment is apparent from what has already been said. It is therefore *affirmed.*