E. G. FORD, Appellee, v. RUDOLPH OTT et al., Appellants.

BILLS AND NOTES: Actions—Fraudulent Procurement. Evidence reviewed, in an action by the holder of a note which the payee procured through fraud, and held insufficient to show that the holder participated in the fraud.

BILLS AND NOTES: Rights and Liabilities on Indorsement or Transfer—Holder in Due Course—Notes Taken after Maturity. One who obtains title after maturity on notes which were procured by the payee by fraud does not take them in due course, unless the parties from whom he took them were holders in due course. (Sec. 3060-a58, Code Supp., 1913.)

BILLS AND NOTES: Rights and Liabilities on Indorsement or Transfer—Good Faith—Burden on Holder. . Under Sec. 3060-a56, Code Supp., 1913, to charge a holder of a note with notice of fraud in relation thereto, it must be shown that he had actual knowledge, either of the fraud or of such facts that taking the instrument amounted to bad faith; and when it is shown that the title of any person who has negotiated a note is defective, the burden is on the holder to prove that he or some person under whom he claims, acquired the title as a holder in due course.

**BILLS AND NOTES:** Actions—Fraud. Evidence reviewed, in a suit on notes, and held to show that the payee had obtained them through his own fraud.

**BILLS AND NOTES:** Actions — Pleadings — Immaterial Variance. In an action on notes, where the answer claimed that they were procured through fraud, a slight variance between the amounts of the notes and the amounts alleged in the answer is immaterial.

**FRAUD:** Effect of and Relief Against—Trust of Victim No Defense. A person guilty of fraud may not be heard to urge that his victim ought to have found him out in time to have protected himself against the perpetrating of the wrong undertaking.

**BILLS AND NOTES:** Actions—Fraud—Reliance on False Statements. Evidence reviewed, and *held* that the maker of a note, defending the same on the ground that it was procured by fraud of the payee, could not be deemed to have been negligent in relying on the false statements of the payee.

**BILLS AND NOTES:** Actions—Execution of Renewal Notes—Failure to Return Original Notes—Damages. The maker of notes was damaged by the fraud of the payee, where, after the making of the same, he was induced to execute renewal notes, under the promise of the payee that the original ones would be returned, but where the original notes had been deposited as collateral, and judgment was recovered thereon, and the maker's land had been sold on sheriff's execution sale; and such damages would be an issue in the suit on the action brought by the holder of the renewal notes.

**BILLS AND NOTES:** Requisites and Validity—Fraud—Nonprejudicial Statements by Maker. Where a maker of notes procured by the payee through fraud paid interest on the notes and part of the principal, after the discovery of fraud, and told the holders that the notes were good, and would be paid at maturity, but the holders changed their position in no way because of what he did or said, and were not prejudiced in any manner, and the plaintiff, when he bought the notes, had never heard of such statements, and did not rely thereon in purchasing the notes, the maker was not estopped from relying on the fraud.

**FRAUD:** Effect of and Relief Against—Essentials to Waiver of Right to Defend. Where the maker of notes procured by the payee through fraud paid interest on the notes and part of the

principal after the discovery of fraud, and told the holders of the notes that they were good, and would be paid at maturity, such conduct did not waive the right to defend against the fraud, as, to constitute a waiver, there must be an intention to relinquish a known right, and since he did not know that the holders of the notes did not acquire the same in good faith, there could be no intention on his part to relinquish his rights against them.

*Appeal from Fayette District Court.*—C. N. HOUCK, Judge.

### JULY 3, 1919.

THREE suits were brought on four promissory notes, secured by mortgage on the maker's land, and judgment and decree of foreclosure prayed. These suits were consolidated, and, on hearing, decree entered as prayed. The defendants Rudolph Ott and Alwine Ott appeal.—*Modified and affirmed.*

*Edwards, Longley, Ransier & Harris* and *Jay Cook,* for appellants.

*E. R. O'Brien* and *R. J. O'Brien,* for appellee.

LADD, C. J.—The three suits on the several notes were consolidated and heard as one. Judgment on four notes and decree of foreclosure of the mortgage securing all of them was prayed. One of these notes was for $4,000, another for $2,500, and the others for $1,000 and $500 each. These notes and mortgage were parts of the same transaction, bearing date May 8, 1912, and payable five years after date. Each was executed by Rudolph Ott and Alwine Ott to Adam Kiefer. The latter, on June 20, 1912, sold and transferred the $4,000 note to Myron Baum, and, after maturity, November 28, 1917, Baum sold and transferred this note to plaintiff. The $2,500 note was sold and transferred by Kiefer to R. M. Campbell, July 13, 1912, and Campbell sold and transferred it to plaintiff on December 8, 1917, after maturity. The $1,000 and $500 notes also were en-

dorsed by Kiefer over to Campbell, February 1, 1913, and by him to plaintiff, after maturity.

The Otts admitted the execution of the notes and mortgage securing payment of same, but denied all other allegations with reference thereto, and averred that they had borrowed different sums of money and given notes to said Kiefer aggregating over $8,000, and, "being without notice or knowledge that said Adam Kiefer had disposed of such notes or did not then own the same, went to said bank for the purpose of adjusting and settling such notes; and the said Adam Kiefer then stated to these defendants that he still owned such notes, but had misplaced them, and that, if the defendants would pay all of such indebtedness above the sum of $8,000, and execute new notes to him, with an extension of five years' time, secured by mortgage, he would find and cancel the then existing notes and mortgages, and return them to these defendants." They further alleged that they were deceived and misled by said statement, and believed that Kiefer then owned the notes, and were induced by his representation to pay all of said indebtedness by executing to him the notes sued on and the mortgage on 160 acres of land securing their payment; that the statements were false, and known by Kiefer so to be, and made for the purpose of cheating and defrauding defendants; and that said notes sued on were negotiated in fraud of defendants' rights. Alleging said notes to be without consideration and procured by fraud, they prayed for equitable relief, and especially that the notes and mortgage be canceled.

In reply, the plaintiff put in issue the allegations of fraud, and pleaded waiver and an estoppel by defendants' conduct in paying interest and some of the principal on the notes, and saying they were good; and also that the defense was barred by the statute of limitation.

I. The pleadings have been referred to specifically, as

the best way to dispose of the contention that plaintiff participated in the fraud alleged to have been perpetrated

by Kiefer. The answer does not so allege.

**1. BILLS AND NOTES : actions : fraudulent procurement.**

Even if it had, however, the evidence failed to show that plaintiff had authorized Kiefer generally to have renewed the notes held by him as collateral security. True, Kiefer then owed Ford $8,000 or $10,000, and had delivered to Ford as collateral security, several notes, including that for $4,400, hereinafter more particularly referred to, and Ford kept these in a box in the bank operated by Kiefer Bros., at Hazelton, but Ford retained the key to the box, while the bank held the master key, so that Ford retained control of the papers. This is the only evidence on which appellants contend that plaintiff participated in the fraud alleged, and it was insufficient to warrant such an inference.

II. As plaintiff obtained title to the notes after maturity, he did not acquire them in due course, unless the parties from whom he obtained them, Baum and Campbell,

**2. BILLS AND NOTES :rights and liabilities on indorsement or transfer : holder in due course : notes taken after maturity.**

were holders in due course. Section 3060-a58, Code Supplement, 1913. The issues, then, are whether the notes were defective because obtained by Kiefer, the payee, by fraud (Section 3060-a55, Code Supplement, 1913), and whether Baum and Campbell, in purchasing these notes of Kiefer, were charged with notice. To so adjudge them, it must appear that they had actual knowledge of the fraud, or of such facts as that "taking the instrument amounted to bad faith." Section 3060-a56, Code Supplement, 1913.

**3. BILLS AND NOTES : rights and liabilities on indorsement or transfer : good faith : burden on holder.**

"When it is shown," however, "that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he or some person

under whom he claims acquired the title as a holder in due course." Section 3060-a59, Code Supplement.

These sections are so clear that explanation seems unnecessary; but see *Lundean v. Hamilton*, 184 Iowa 907; *German American Nat. Bank v. Kelley*, 183 Iowa 269.

It appears from the record that, prior to May 7, 1907, the Otts had given Adam Kiefer a note for $2,000, and secured it by a mortgage on 40 acres of land, and that, on May 9th of the same year, they purchased

4. BILLS AND NOTES : actions : fraud.

of Adam Kiefer 80 acres of land, and executed in part payment thereof a note for $4,400 to him, securing the same by a mortgage on the land. These notes matured May 8, 1912, to which time defendants had paid the interest. A few days later, Kiefer went out to see Rudolph Ott, when the latter said to him that he would like $1,600 more, to pay some debts; and Kiefer, after examining the premises, responded that he would make the additional loan, and all would amount to $8,000. Ott testified that:

"When he had new notes made out, I asked him, before he took the notes, I asked him where he had the old notes, and he said he got it to home, and he forget it,—he said he forget it. He was going to send them to me. He said he had it, the note he was going to send it to me. He was to send them and cancel them; the $2,000 note and the $4,400 note. He made out notes and mortgages for $8,000, and this is the $8,000 represented by the note of $4,000, the note of $2,500, the note of $1,000, and the note of $500, that has been offered in evidence here; that is the notes that was made out that day. * * * When he told me he still had the $2,000 note and the $4,400 note down at Hazelton, I believed him. I thought he had it; that induced me to give him the new ones. He was going to send me the old ones back. The $1,600 was the only money consideration there was for the $8,000 of notes, and the rest of the con-

sideration was the $4,400 note and the $2,000 note I owed Adam. I did not know he had sold it to anybody."

An attorney, whom Ott had consulted, testified, on cross-examination, that Ott had told him that:

"Kiefer had obtained from him a note of $2,000 and a note of $4,400, and had come to him when these notes were due, and represented that he still held the notes and wanted to renew them, and that he had forgotten the notes and left them in the bank; but that, if Ott would renew them, give new notes and take some additional money, $1,600, that Ott wanted, that he would cancel the old mortgages securing these notes, and return him the notes."

This evidence was not objected to, and, though hearsay, was corroborative of Ott's testimony. The evidence recited was not contradicted, but was somewhat discredited by Ott's payment of interest and on the principal, and by his statement that the notes were good and would be paid, made after he had discovered the fraud. But Ott was an unlearned man, could not read or write the English language, and what he may have said should be given no more weight than the opinion of such a person on such subjects ordinarily would be accorded. Kiefer was not called to contradict what Ott swore he had represented, and it was a representation such as a person bent on obtaining the notes would be likely to have made; and we entertain no doubt as to the accuracy of Ott's account of the transaction. Nor do we entertain any doubt that Kiefer intended Ott to understand that he (Kiefer) still owned and retained the papers, and that they were so subject to his control that he could cancel and return them. As contended, the promise to surrender them was not a representation of an existing fact. Because of the assumption implied in the promise,—i. e., that he could surrender the subjects of that promise,—this was corroborative of the testimony that he represented that he retained them.

Much is said of the pleading by counsel for appellee; but, even if the answer did not recite the facts accurately, enough was proved, necessarily included within such allegations of the answer, to make out the defense. The indebtedness to Kiefer is there said to be more than $8,000; but it was not essential that this much be proven. That too large a sum was named did not obviate making out the defense by showing that the actual amount was only $6,400. Nor was it a fatal variance to prove that, instead of the payment of an excess by Ott, he received $1,600 in addition to the $6,400 evidenced by the two notes. The gravamen of the charge was that Kiefer made misrepresentations concerning the two notes for $4,400 and $2,000, respectively, and thereby fraudulently induced the Otts to execute the notes in suit. Whether Kiefer stated that he left the notes at home or at the bank or somewhere else, such statement, together with the remainder of the conversation, clearly indicated that he intended to and did represent that he held the notes; whereas, the note for $4,400 had been turned over to Ford as collateral security long before, and had been continuously held by him. It appearing that the notes were obtained by fraud, the burden was on the plaintiff to show, by a preponderance of evidence, that Baum and Campbell acquired them in due course. No evidence whatever, bearing on that issue, was adduced; and, unless in some way obviated, the defense that the notes were obtained by fraud should be sustained to the extent of the amount owed on the note of $4,400, that for $2,000 not appearing to have been negotiated.

*5. BILLS AND NOTES: actions: pleadings: immaterial variance.*

III. Counsel for appellee also argues that Ott was negligent in believing Kiefer's statements, in substance, that he still held the notes, and in relying on his promise

to return them. A person guilty of fraud

**6. FRAUD: effect of and relief against: trust of victim no defense.** may not be heard to urge that his victim ought to have found him out in time to have prevented the wrongdoer from perpetrating the wrong undertaken. *Holmes v. Rivers,* 145 Iowa 702; *Fargo Gas & Coke Co. v. Fargo Gas & Elec. Co.,* 4 N. D. 219 (37 L. R. A. 593, and extended note). In any event, there is no warrant in the record for saying that

**7 BILLS AND NOTES: actions: fraud: reliance on false statements.** Ott was negligent in relying on Kiefer's statements; for he did precisely what an ordinarily prudent person would be likely to have done, under like circumstances.

IV. Another contention is that Ott was not shown to have been damaged by the fraud perpetrated. The petition alleged that judgment for $7,968.74 had been recovered by plaintiff; and it appears from the

**8. BILLS AND NOTES: actions: execution of renewal notes: failure to return original notes: damages.** record that this was on the note of $4,400, heretofore referred to, and that the 80 acres on which it was secured was sold on sheriff's execution, July 5, 1918, in satisfaction thereof. This would be sufficient showing of damage on which to base relief against the notes given in renewal thereof, without consideration to the extent of amount due on the $4,400 note.

V. In March, 1913, Kiefer Bros.' bank failed; and, as we understand the record, Kiefer went into bankruptcy. See *State v. Kiefer,* 183 Iowa 319. Ott was informed of this

**9. BILLS AND NOTES: requisites and validity: fraud: nonprejudicial statements by maker.** a few days later, and that the note for $4,400 was held by Ford. Notwithstanding this, Ott paid interest on all the four notes sued on, May 8, 1913, and on May 8, 1914, and on the $2,500 note on August 7, 1915. He paid, on August 12, 1913, $250 of the principal of the $500 note, and in September of the same year, $100 more thereon. On several of these occasions, he

told the holders of the notes that these were good, and would be paid at maturity; but there was no evidence tending to show that either of these holders changed their position in any way because of what Ott did or said, or that either was prejudiced in any manner; and there was no evidence that plaintiff had ever heard of such statements, or relied thereon in purchasing the notes. Manifestly, the plea of estoppel was not sustained by the evidence, for the reason, if for no other, that prejudice did not result from anything done or said by defendant.

VI. The main contention of appellee is that, by paying the interest and on the principal, and by making the statements, all as recited above, the makers waived the fraud perpetrated by the payee, Kiefer, and

10. FRAUD: effect of and relief against: essentials to waiver of right to defend.

elected to perform, notwithstanding the deceit practiced. True, the reply denominated what is claimed, "ratification," and this seems a misnomer; but, as the allegations asserted condonement or waiver, in fact, it is quite immaterial what it was called. That the notes were procured by fraud rendered them voidable, not void; and, of course, it was optional with the maker whether or not he would challenge their legality. This, he was not bound to do until the holders sought to enforce the collection, and then might interpose the defense that the notes were obtained by fraud, and were, in part, without consideration. Were the suit to rescind, and cause the notes and mortgage to be canceled, a different rule would obtain, and he must have acted promptly. See *Lundean v. Hamilton*, 184 Iowa 907. The defense of fraud, then, was available, unless waived. By waiver is meant the voluntary or intentional abandonment of a known right. *Currie v. Continental Cas. Co.*, 147 Iowa 281; *Norton v. Catholic Order of Foresters*, 138 Iowa 464, 467. Bishop, in his work on Contracts, defines the word more fully:

"Waiver, in a general way, may be said to occur when-ever one in possession of a right conferred either by law or by contract, and knowing the attendant facts, does or forbears to do something inconsistent with the exercise of the right, or of his intention to rely upon it, in which case he is said to have waived it, and he is estopped from claim-ing anything by reason of it afterwards."

And this definition was approved in *Mettner v. North-western Nat. L. Ins. Co.*, 127 Iowa 205. It differs from estoppel in that, in waiver, the result is voluntary; while, in estoppel, the conduct may have been voluntary, without purpose of losing any asserted rights, and yet, if such con-duct misleads, estoppel arises. One is the voluntary sur-render of a right, and the other is the inhibition to assert it, from the mischief that has followed. See *Hoxie v. Home Ins. Co.*, 32 Conn. 21 (85 Am. Dec. 240) ; *Shaw v. Spencer*, 100 Mass. 382 (97 Am. Dec. 107) ; *Libby v. Haley*, 91 Me. 331 (39 Atl. 1004). Other differences are pointed out in 40 Cyc. 255.

As said in *Metcalf v. Phenix Ins. Co.*, 21 R. I. 307 (43 Atl. 541) :

"A waiver arises by the intentional relinquishment of a right by a person or party, or by his neglect to insist upon his right at the proper time, and does not imply any conduct or dealing with another by which that other is induced to act or forbear to act to his disadvantage; while an estoppel necessarily presupposes some such conduct or dealing with another."

To constitute a waiver, two things are essential: First, there must be knowledge of the existence of the right; and second, an intention to relinquish it. *Cutler v. Roberts*, 7 Neb. 4 (29 Am. Rep. 371) ; *Hoxie v. Home Ins. Co.*, supra; *Perin v. Parker*, 126 Ill. 201 (2 L. R. A. 336; 9 Am. St. 57) ; *Fitzpatrick v. Hartford L. & Ann. Ins. Co.*, 56 Conn. 116 (7 Am. St. 288).

What is it, then, that Ott is said to have waived? The right to interpose the defense that the notes were obtained by fraud, against the then holders of the notes. Baum and Campbell were then the holders. What Ott said to one or both of them was merely an expression of opinion, and an indication that he expected to pay. Neither his opinion as to the character of the obligations nor his statement that these would be paid at maturity appears to have misled the endorsees, or to have lulled them into security. And this is true with respect to the payments of interest and on the principal. As the consideration of the notes to the extent of $1,600 was never questioned, this much must have been paid; and, therefore, no significance could well be given the payments on the principal. Nor are we inclined to the view that the payments of interest to the endorsees ought alone to be regarded as a waiver of the deceit practiced in procuring the notes. Had this misled the holders in any manner, or so lulled them into security that they did or omitted to do something that otherwise would have been done or omitted, the situation would have been different. A naked act or statement, without more, never constitutes a waiver; and this is illustrated in the numerous authorities cited by counsel for appellee. Thus, in *Taylor & Son v. First Nat. Bank,* 212 Fed. 898, one with full knowledge of the facts constituting a defense to his note secured an extension on the face of his promise to pay on the new maturing date, and it was held that he ratified the instrument, and waived the defense. In *MacKenzie v. Eschman's Exr.,* 174 Ky. 450 (192 S. W. 521), the party alleged to have been defrauded, "after obtaining knowledge of the fraud, not only assured Patterson that he had acted in good faith, but endorsed notes for $5,200, for the purpose of carrying out the contract (alleged to have been fraudulent), and thereafter collected and retained money which he had

no right to collect or retain, except by virtue of the contract." And the court said:

"Having, with knowledge of the fraud, enjoyed the fruits of the contract, and having repeatedly affirmed the contract ' by other unequivocal acts, he has thereby condoned the fraud, and neither he nor his father's executors will now be permitted to rely on that defense."

In *Morgan v. Nowlin,* 126 Mich. 105 (85 N. W. 468), the party from whom a note was alleged to have been obtained by fraud renewed the note. See, also, *State Bank v. Brown,* 142 Iowa 190; *Loos v. Callender Sav. Bank,* 174 Iowa 577; *Tichenor v. Owensboro Sav. Bank & T. Co.,* 24 Ky. 145 (68 S. W. 127) ; *Doherty v. Bell,* 55 Ind. 205; *Rindskopf Bros. & Co. v. Doman,* 28 Ohio St. 516. We have discovered no decisions to the contrary.

In *Underwood v. Farmers' Joint Stock Co.,* 57 N. Y. 500, the court, speaking through Earl, Commissioner, said:

"The doctrine of estoppel lays at the foundation of the law as to waiver. While one party has time and opportunity to comply with a condition precedent, if the other party does or says anything to put him off from his guard and to induce him to believe that the condition is waived, or that a strict compliance with it will not be insisted on, he is afterward estopped from claiming non-performance of the condition. Unless there is some consideration for a waiver, or some valid modification of the agreement between the parties which contains the condition, I think there can be no waiver of a condition precedent, except there be in the case an element of estoppel. At the time when the affidavit was drawn, the plaintiff had forfeited his rights under his policy. Nothing that was then said or done induced him in any way to forego any of his rights, or to omit the performance, on his part, of anything required by his policy; and, hence, furnished no estoppel against the defendant."

The same doctrine will be found in *Elliott v. Lycoming County Mut. Ins. Co.*, 66 Pa. 22 (5 Am. Rep. 323).

As was remarked in *Kennedy v. Manry*, 6 Ga. App. 816 (66 S. E. 29) :

"Waiver belongs to the family of estoppel, in a sense, and yet an estoppel *in pais* has connections that are no kin to waiver. Waiver depends upon what one himself intends to do; estoppel depends rather upon what he causes his adversary to do. Estoppel may carry the implication of fraud; waiver by election does not."

To constitute a waiver, it is not essential to show that the other party has actually been prejudiced. He may have been benefited. But the facts constituting the waiver must be such as are calculated to lead the other party to do or omit to do what he otherwise might not have done or omitted,—as to have lulled him into security when otherwise he might have taken precaution for his own protection, or have acted in some manner otherwise than he in fact did.

While Ott was aware that Kiefer, the payee, perpetrated a fraud on him in obtaining the notes sued on, the record is silent as to whether he had any knowledge that the defense of fraud was or would be available against the then holders of the notes. For all that appears, Ott knew nothing of this, and may have paid the interest and on the principal and made the statements with reference to said notes in the belief that Baum and Campbell were purchasers for value, and without notice of the defense in the title to the notes. Had he been informed, prior to the payments of interest, and his statements accompanying same, that the endorsees were not bona-fide holders thereof, there would be strong ground for saying that this would have amounted to such recognition of his obligations to pay as would amount to a condonement of the fraud or waiver of the defense. Though he must be assumed to have known that the burden to show that the holders acquired the notes in good

faith rested on the then holders, he was not bound to know whether they would be able to make such proof, or that this would not be undertaken; and the presumption of *mala fides* arising from the proof of defective title should be allowed to prevail. In the absence of any showing of being aware of having available defense, Ott could not well have intentionally or voluntarily abandoned the same. · Nothing that happened is inconsistent with the conclusion that Ott made his payments, and the statements recited, in the belief that Baum and Campbell were holders of the note in due course; and if he so did without knowledge to the contrary, the defense should be held not to have been waived, and, to the extent of the face of the $4,400 note, with interest thereon from the date to which interest was paid, should be allowed. The burden of proof to establish the waiver was on the plaintiff. 40 Cyc. 269. *Bergeron v. Pamlico Ins. & Bk. Co.*, 111 N. C. 45 (15 S. E. 883) ; *Rosen v. German Alliance Ins. Co.*, 106 Me. 229 (76 Atl. 688).

The court erred in not sustaining the defense of fraud and want of consideration, to the extent of the note for ' $4,400 taken up by the notes sued on, with interest from May 12, 1914. As modified, the decree will be and is affirmed.—*Modified and affirmed.* ·

WEAVER, GAYNOR, and STEVENS, JJ., concur.