L. A. ANDREW, Superintendent of Banking, Receiver, Plaintiff,
D. W. BATES, Superintendent of Banking, Receiver,
Substituted Plaintiff, Appellee, v. CHARLES
W. BAIRD, Appellant.

No. 42986.

FEBRUARY 13, 1936.

H. C. & H. C. Taylor, for appellant.

Earl F. Wisdom, for appellee.

KINTZINGER, J.—On February 1, 1932, L. A. Andrew, appellee, and Charles W. Baird, appellant, entered into an agreement for the settlement of an action commenced against said Baird and other directors of the Floris Savings Bank upon a contract entered into between the parties in June, 1927, to guarantee certain securities of said bank, amounting to about $23,000. The bank closed its doors in June, 1930, when L. A. Andrew, state superintendent of banking, was appointed receiver of the Floris Savings Bank and Buell McCash his attorney.

The guaranty agreement was found among the assets of the bank by the receiver, and on January 21, 1932, he commenced an action against the defendant and other signers for a balance of $7,800 due thereon. On February 1, 1932, an agreement for the settlement of this obligation was entered into between H. E. Lindberg, the examiner in charge, and Mr. McCash, the attorney

for the receiver, under the terms of which Baird was to pay the receiver $1,000 for a full release, discharge, and cancellation of the obligation. This settlement was approved by the court on February 20, 1932, whereupon the money was paid to the receiver and the guaranty agreement was released and returned to the makers.

Thereafter, on November 26, 1932, the receiver commenced this action to set aside the settlement entered into February 1, 1932, on the ground of fraud, alleging in substance that at the time of the settlement the defendant falsely and fraudulently represented to the appellee that he was financially worthless, that he had no property except a 13-acre homestead, and that all of the signers to the agreement were insolvent and execution proof.

In his petition, the receiver alleges that these statements were false, in that the defendant, Baird, at the time of the settlement, had two first mortgages upon 258 acres of land in Davis county, Iowa, aggregating $17,000, the existence of which was concealed from this receiver, that the receiver relied upon appellant's statements as to the financial worth of himself and the other signers of the guaranty agreement that they had no property subject to execution, and alleges that the statements made by defendant, Baird, were false, and made with the intent of deceiving the receiver and procuring a settlement of the guaranty obligation for a small per cent of the amount due thereon.

The evidence shows without dispute that the defendant, Baird, at the time this settlement was made, was the owner of the two mortgages upon 258 acres of land in Davis county, amounting to $17,000.

It is conceded by both parties hereto that it is the settled rule of law in this state that, in order to warrant the cancellation of an agreement of settlement on the ground of fraud, it is necessary to show (1) that the statements alleged were in fact made; (2) that the statements were false; (3) that they were known to be false by the party making them; (4) that they were made with the intent of deceiving appellee; and (5) that the appellee relied thereon.

It being conceded that such is the rule, a discussion of law thereon is unnecessary here.

The most vital question involved in this case, therefore, is

one of fact; that is, whether or not the defendant, Baird, did, at or about the time the settlement was made, make the false statements attributed to him.

I. The first question for consideration, therefore, is whether or not the statements alleged were established by the evidence. A determination of this question requires a further review of the evidence. It is undisputed that the action upon the guaranty agreement referred to was commenced on January 21, 1932. The evidence also shows that within two days thereafter the defendant, Baird, called at the office of Mr. McCash, the attorney for the receiver, with the apparent purpose of securing a settlement of that action.

Mr. McCash testified that:

"Baird at that time said * * * that the case ought to be settled; that judgment for the amount sued on could not be realized, and asked if he couldn't take care of the matter. * * * That Baird at that time said that he and some of the other signers 'had borne the burden of keeping the bank open and suffered enough loss by reason of paper that they had taken up out of the bank,' and that * * * 'we are all broke,' and that he had nothing left but his 13 acre homestead. * * * That Mr. H. E. Lindberg was the examiner-in-charge of the bank for the receiver; and * * * told Mr. Baird to see him. That he is the man that makes the settlements."

Mr. Lindberg, the examiner in charge, testified that Baird called upon him twice between January 21 and February 1, 1932, and that at both times Baird told him that

"he didn't see how he or any of them (the other defendants) could do very much; that all he had out there was his 13 acre homestead; that he had sustained some losses by taking notes out of the bank and was having a hard time, and was working on the roads to help make a living."

The next talk of settlement was had at a meeting in Attorney McCash's office on February 1, 1932, between Mr. Lindberg and Mr. McCash, representing the receiver, and the defendants Baird, Heady, and Benge, three of the signers on the guaranty agreement. At that meeting there was talk of a settlement. Baird said that at that meeting:

"Benge didn't say much because he said he wasn't in shape

to pay his share, and the other boys weren't. Mr. Heady said he believed he could raise $300 and I told them if I could get Rouch to help me, I could raise the balance above $300."

McCash and Lindberg were so advised, and Baird said that

"money was scarce with him. He didn't know how he could do it, but if he could get Rouch and get $300 out of him, he would raise $400 and pay them a thousand dollars."

McCash then called Rouch over the telephone for Baird, and turned the telephone over to him, and Baird then talked to Rouch. Lindberg and McCash both say that they heard Mr. Baird try to get Mr. Rouch to contribute his share towards a settlement. They also say that Mr. Baird said over the telephone "that they were making a settlement on this guaranty and they wanted him to contribute his share," and that *"you know we are all broke and we have to do our part."* Mr. Baird testified that "Rouch agreed to give him (Baird) a note for $300," and Baird then told Rouch over the telephone that, "if he (Rouch) promised to do that, he (Baird) would borrow the money and pay it for him." After that telephone conversation, a settlement of the action for $1,000 was agreed on, subject to the approval of the receiver and the court.

So we have here the testimony of Mr. McCash and Mr. Lindberg testifying that Baird said to them and in their presence on four different occasions that he and the other signers "were broke." The first statement to this effect was made in McCash's office on January 23, 1932, two days after the action on the guaranty agreement was commenced. The second and third statements were made to Mr. Lindberg at the bank between January 21 and February 1, 1932, and the fourth statement was made at McCash's office on February 1, 1932, in the presence of Lindberg, McCash, and Heady and Benge, two other signers, in Baird's talk to Mr. Rouch over the telephone.

The only positive contradiction of this testimony is that of Mr. Baird, who denies that he ever made the statements that "they were all broke, or that he had no other property except his 13 acre homestead."

Mr. Benge does not deny that Baird told Rouch over the 'phone, "You know we are all broke." All he said is. "I did not hear Baird say anything to McCash or Lindberg regarding

his financial condition," but says nothing at all about what Baird told Rouch over the telephone.

Mr. Heady, who was also in McCash's office at the time, says that all he heard of the conversation with Rouch was that Baird said, "money was hard to get"; he does not deny that Baird said "he was broke" or "that we are all broke," but only says "he don't think Baird said that to anyone." This is substantially all of the testimony in relation to the statements made by Mr. Baird to or in the presence of Mr. Lindberg and Mr. McCash or in relation to the telephone communication between Baird and Rouch in McCash's office on February 1, 1932. So that we have here the positive testimony of Mr. McCash and Mr. Lindberg as to statements made by Baird to the effect that he and the other signers of the guaranty agreement were all broke and that none of them had any property subject to execution, as against the testimony of Mr. Baird that such statements were not made and the negative testimony of Mr. Heady that he "didn't think" such statements were made by Baird to Rouch over the telephone.

From this testimony the lower court found that the statements alleged to have been made by Mr. Baird as to the financial condition of himself and his codefendants were established.

After a careful consideration of all the testimony bearing upon this subject as shown by the record, we are constrained to hold that the finding of the lower court upon this question was correct.

II.   The next essential fact to be established in order to establish fraud is that the statements made were false. It is our finding, as shown by the preceding division of this opinion, that such statements were made. It is shown by the undisputed evidence that Mr. Baird, at the time the settlement was agreed upon, was the owner of two separate first mortgages upon 258 acres of land in Davis county securing notes owned by him in the sum of $17,000.

As we have found that the statements were made, and as the uncontradicted evidence shows that he did have other property subject to execution, it necessarily follows that the statements made were false.

III.   It is contended, however, that it is also necessary to show that, although the statements were false, it must be

shown that they were made with the intent of deceiving appellee and for the purpose of securing a settlement.

It is the settled rule of law in this state that, where it is shown by the evidence that false representations are made with knowledge on the part of the person making them that they are false, the intent to deceive is presumed as a matter of law and no other positive proof is required. Boddy v. Henry, 126 Iowa 31, 101 N. W. 447; Shuttlefield v. Neil, 163 Iowa 470, 145 N. W. 1; Farmers' Sav. Bank v. Jameson, 175 Iowa 676, 157 N. W. 460, L. R. A. 1916E, 362; Murphy v. Nat. Trav. B. Ass'n, 179 Iowa 213, 161 N. W. 57, L. R. A. 1917C, 338; Hills Savings Bank v. Cress, 205 Iowa 306, 218 N. W. 74.

In the case of Boddy v. Henry, 126 Iowa 31, loc. cit. 36, 101 N. W. 447, 449, the court says:

"It is not correct to say that when the plaintiff in an action of this kind [fraud] has proved that the alleged false representations were in fact made, and that defendants knew them to be false when made, there still remains upon the plaintiff the burden of proving that defendants intended thereby to deceive and mislead. The true rule, as we interpret the law, is that when the party charging false and fraudulent representations has shown that the representations were made, and that they were false, and known to be false by the party making them, the intent to deceive is implied or presumed. * * * The scienter as well as the falsehood being proved, proof of the fraudulent intent is regarded as conclusive. Evidence that the defendant intended no fraud will not be received, and the jury will be instructed to find for the plaintiff, though they should be of the opinion that the defendant was not instigated by a corrupt motive of gain for himself, or by a malicious motive of injury to the plaintiff."

In Farmers Savings Bank v. Jameson, 175 Iowa 676, loc. cit. 705, 157 N. W. 460, 469, L. R. A. 1916E, 362, this court says:

"Counsel vigorously contend that there is no proof of any intent on the part of the defendant to deceive or defraud. Such fact can rarely be proved by direct testimony, and hence the rule that such intent may be inferred; and if it be shown that the representations were false in fact, were known to the defendant to be false, and were made with the intent that they

be acted upon, and in truth they are relied upon, intent to deceive and defraud may be inferred. This presumption or inference is not conclusive, but is sufficient to justify a jury in finding that this element essential to a recovery is established. Davis v. Land Co., supra [162 Iowa 269, 143 N. W. 1073, 49 L. R. A. (N.S.) 1219]; Boddy v. Henry, 126 Iowa 31, 101 N. W. 447; Riley v. Bell, 120 Iowa 618, 95 N. W. 170.''

In Hills Savings Bank v. Cress, 205 Iowa 306, loc. cit. 312, 218 N. W. 74, 77, this court says:

''It is urged, however, that there is no evidence whatever in the record to show that there was an actual intent to defraud or deceive. With this we cannot agree. Primarily on the question of intent to defraud and deceive, direct evidence is rarely attainable. Such conclusion must be drawn from the surrounding facts and circumstances in the case; and especially in a case of this kind, where one is called upon to tell things which he knows of his own knowledge, and he does so, the jury may be warranted in finding, under such condition and the surrounding facts and circumstances, that the statements made by him are knowingly falsely made, and with intent to defraud and deceive. * * * The facts in evidence in this case would suggest that the jury might have found that when these representations were made, they were material; that they were false and fraudulent, and made with an actual intent to deceive and defraud; that the same were untrue; and that the bank believed, acted, and relied upon them to its prejudice,—and this was sufficient to take the case to the jury.''

So. in the case at bar it is shown that, when the action against the defendant and his cosigners on the guaranty agreement was commenced, he almost immediately sought out the examiner in charge and his attorney, for the purpose of getting a settlement. He called upon the attorney for the receiver on the second day after the case was commenced, and called upon the examiner in charge of the bank twice between January 21 and February 1, 1932, and had a final meeting at McCash's office February 1, 1932. It is shown that he made the statements substantially as alleged to each of them individually, and again in the presence of both of them in a telephone conversation with Mr. Rouch in McCash's office, that ''he and all of the cosigners

were broke," and that all he had left was his homestead property of 13 acres. It is shown that these statements were false and that he knew them to be so when made.

The lower court found that the evidence was sufficient to show the fact that the defendant intended by such statements to deceive the receiver of the bank, for the purpose of securing a settlement of a $7,800 obligation for a fractional part thereof.

We are constrained to hold that the finding of the lower court was correct, and it is our finding that the intent to deceive has been established by clear and convincing evidence.

■■■ IV. It is urged, however, that the receiver of the bank was not entitled to rely upon the statements made by Baird as to his financial condition because of the existence of certain data in the office of the state superintendent of banking, from which the receiver could easily have ascertained the truth or the falsity of the statements made by Baird as to his financial worth. The evidence relied upon as tending to show that the receiver had such information consists of reports made by a bank examiner in the course of his duties, before the Floris Bank became insolvent. One of these reports, dated January 19, 1929, shows that Baird's worth at that time was $12,000. Another report, dated July 17, 1929, shows that he was then worth $12,000. Another report, dated February 6, 1930, shows Baird's worth to be about $25,000. These reports were all made to the superintendent of banking long before a receiver of the bank was appointed. Although these reports were in the office of the superintendent of banking as such, there is no evidence tending to show that they ever came into the files of the "receiver" of the Floris Savings Bank after his appointment as such. Those reports were made long before the closing of the Floris Bank, and over two years before the time the settlement in question was made. They fail, however, to reveal the existence of any mortgages. Such evidence is not sufficient to entitle appellant to claim any relief from his own false statements as to his financial condition at the time the settlement in question was made. Riley v. Bell, 120 Iowa 618, 95 N. W. 170; Holmes v. Rivers, 145 Iowa 702, 124 N. W. 801; Hise v. Thomas, 181 Iowa 700, 165 N. W. 38; Ford v. Ott, 186 Iowa 820, 173 N. W. 121; Creamer v. Stevens, 192 Iowa 920, 185 N. W. 581; Strand v. Griffith (C. C. A.) 97 F. 854.

In Riley v. Bell, 120 Iowa 618, loc. cit. 626, 95 N. W. 170, 172, this court said:

"But appellant says that, conceding even the making of the representation alleged * * * no recovery should be allowed, inasmuch as plaintiff had no legal right to rely upon such representation, and so make no further effort to ascertain the real condition of the title to the lands. In this we do not agree. If defendant in fact knew the condition of the title, it was his duty to truthfully represent the same, if he essayed to speak at all upon the subject. * * * Now, if plaintiff acted upon such representation in good faith, and to his damage, both reason and authority unite in authorizing a recovery for the damage thus sustained. Under the circumstances here presented, we think it does not lie in the mouth of one charged with such a fraud to say that an examination of the county records would have disclosed his untruth and laid bare his attempted fraud. Where one is shown to have made statements of the character here in question, the law presumes that he intends that the same shall be relied upon. If the party to whom they are made does in good faith rely thereon, he may recover, notwithstanding it may appear that opportunities were open to him to ascertain the truth by investigation and examination."

In Holmes v. Rivers, 145 Iowa 702, loc. cit. 709, 124 N. W. 801, 803, this court said:

"A seller who has successfully entrapped his victim by false statements of the kind mentioned will not be permitted to escape when called upon to account in a court of justice on the ground that his dupe did not, but ought to have suspected him to be a knave."

In Hise v. Thomas, 181 Iowa 700, loc. cit. 705, 165 N. W. 38, 40, this court said:

"We are not inclined to encourage falsehood and dishonesty by protecting one who is guilty of such fraud, on the ground that his victim had faith in his word, and for that reason did not pursue inquiries that would have disclosed the falsehood."

In Ford v. Ott, 186 Iowa 820, loc. cit. 827, 173 N. W. 121, 124, this court said:

"Counsel for appellee also argues that Ott was negligent

in believing Kiefer's statements, in substance, that he still held the notes, and in relying on his promise to return them. A person guilty of fraud may not be heard to urge that his victim ought to have found him out in time to have prevented the wrongdoer from perpetrating the wrong undertaken."

In Strand v. Griffith (C. C. A.) 97 F. 854, 856, the court said:

"There is no rule of law which requires men in their business transactions to act upon the presumption that all men are knaves and liars, and which declares them guilty of negligence, and refuses them redress, whenever they fail to act on that presumption. The fraudulent vendor cannot escape from liability by asking the law to applaud his fraud and condemn his victim for his credulity."

The evidence also shows that the assessment rolls for 1932 showed that Baird had moneys and credits amounting to about $13,000. Of course, this evidence was not available on February 1, 1932, because the rolls for that year were not made up until long after that time.

The evidence also shows that one of the real estate mortgages referred to as being owned by Baird at the time of the settlement was released on the records on January 23, 1932, the second day after the action upon the guaranty agreement was commenced, being the very day he called upon the receiver's attorney seeking a settlement. While this mortgage may have been exchanged for another, it was not recorded again until long after the settlement was made. The evidence also shows that the other mortgage referred to was not placed upon the records until long after the settlement in question was entered into.

It is therefore clear that, if the receiver had made an examination of the records at the time the settlement was entered into, he would at that time have found no evidence of Baird's financial worth.

Appellant cites a number of cases announcing a rule similar to that announced in Wead v. Ganzhorn, 216 Iowa 478, 249 N. W. 271, holding that, where plaintiff has equal information of certain knowledge as the defendant, he has no right to rely upon defendant's statements. In Wead v. Ganzhorn, however, the persons purchasing corporation stock, upon false represen-

tations as to its earning capacity, were already stockholders, had been active in conducting the affairs of the corporation, were expert bookkeepers, were present at all stockholders' meetings, had access to the books, had full knowledge of the earnings of the corporation, and had equal means of information about the affairs of the corporation as the party selling the stock.

The case at bar is clearly distinguishable from that class of cases. The reports of the bank examiners referred principally to the financial condition of the bank. They made no examination into the business affairs of Mr. Baird, and the report simply contained their estimate of Mr. Baird's financial worth. There is nothing to show that they had any further information about that except his own statement.

Furthermore, these reports were made at least two years prior to the time the settlement in question was made, and, if such reports could be considered notice to the receiver of Baird's financial condition, they refer to a time too remote to charge him with knowledge of such condition on February 1, 1932, in view of Baird's statements that he was then insolvent.

The evidence clearly shows that appellee relied upon the statements made by Baird as to his financial condition at the time the agreement for the settlement was entered into, and it is our conclusion that appellant is not entitled to any relief simply because appellee took his word for his financial worth instead of attempting to ascertain what other records might disclose.

■■■ V. Some claim is also made for the fact that the representations were made to Lindberg, the examiner in charge, and to McCash, the attorney for the receiver, and that, because such representations were not in fact made to Andrew, the receiver, personally, no fraud was practiced upon him. It is the rule of law, however, in this state that fraud practiced upon an agent is fraud upon the principal. Wells v. Telegraph Co., 144 Iowa 605, loc. cit. 622, 123 N. W. 371, 24 L. R. A. (N. S.) 1045, 138 Am. St. Rep. 317.

The evidence shows that a report of the settlement agreed upon was made to the receiver by the examiner in charge, wherein he stated that from the information had he was satisfied that the defendant and cosigners on the guaranty agreement were execution proof, and that any money the plaintiff could recover by way of settlement would be "velvet". Mr. Lindberg also

testified that the information he so reported to the receiver was received by him from Mr. Baird, the defendant in this action.

In the case of Wells v. Telegraph Co., supra, loc. cit. 622, this court, quoting from Culliford v. Gadd, 139 N. Y. 618, 35 N. E. 205, said:

"The evidence warranted the jury in concluding that this representation was made by the defendant. It is not a defense to show that the representations were not made to the plaintiff in person, but were made to her agent, so long as they induced the payment of the money. Fraud committed on the agent is fraud upon his principal."

It is shown by the evidence in this case that the false statements were made by Baird to Mr. Lindberg and Mr. McCash, the agent and attorney, respectively, for the receiver; that the substance of such statements was communicated to the plaintiff and the settlement was made upon that information. It is our conclusion that the fraudulent statements made by appellant to the agent of the receiver constituted fraud upon his principal.

The lower court found that the defendant, Baird, was guilty of such fraudulent acts in connection with the settlement in question as to warrant a cancellation thereof. We have carefully reviewed the record in this case and find no errors therein. We are constrained to hold that the evidence is sufficiently clear and convincing to justify the decree entered.

For the reasons hereinabove set out, the judgment and decree of the lower court is hereby affirmed.—Affirmed.

DONEGAN, C. J., and ALBERT, POWERS, HAMILTON, RICHARDS, and PARSONS, JJ., concur.